STAUFFER et al. v. UTAH OIL REFINING CO.

No. 4899.   Decided January 10, 1935.   (39 P. [2d] 725.)
Rehearing Denied, April 6, 1935.

*H. S. Tanner,* of Salt Lake City, for appellants.

*Ball, Musser & Mitchell,* of Salt Lake City, for respondent.

ELIAS HANSEN, Justice.

The subject-matter of this controversy is the rights of the parties in and to subterranean water. The plaintiffs and defendant were, at the time of and prior to the trial of this cause, the owners in severalty of various parcels of land, all situated in the northwest part of Salt Lake City, Utah. At the time of the trial, and for many years prior thereto, plaintiffs' lands were used for residential purposes. Near plaintiffs' lands defendant operated a refining plant for the treatment of crude oil so as to obtain therefrom gasoline, oil, and other products. By means of artesian wells driven on their lands, plaintiffs were supplied with water for culinary use in their homes and for the irrigation of their lawns, trees, and gardens. Defendant purchased a tract of land in the vicinity of the lands owned by the plaintiffs and in 1920 drilled thereon 6 artesian wells. The pipe used by defendant in its wells was 6 inches in diameter. The water obtained from the wells so drilled by defendant was conveyed by means of a pipe line to its refining plant and there used in the operation of the plant. In order to

secure water for its needs at its plant, defendant connected all of its 6 wells with pipes and installed two pumps for the purpose of sucking the water from its wells and forcing it to its plant. Only one of the pumps was operated at any given time, the others were kept in readiness for use in case something went wrong with the operating pump.

Plaintiffs brought this action to enjoin defendant from operating its pumps and to recover money judgments against the defendant for the damage which each of the plaintiffs claimed he had sustained by reason of defendant having deprived him of water to which he claimed he was entitled. In its answer defendant alleged that it was the owner of the water which it had used and which it intended to continue to use and that it had not deprived plaintiffs, or either of them, of any of their water. A trial was had before the court sitting without a jury upon the question of whether or not an injunction should issue. Findings of fact, conclusions of law, and judgment were made and entered in favor of the defendant. Plaintiffs appeal. The trial court found that only eleven of the plaintiffs secured water from the underground basin that supplied defendant's wells, and that the eleven plaintiffs, whose artesian wells had the same source of supply as the wells of the defendant, had failed to show that the defendant had used or was using more of the water of that basin than it was entitled to. Plaintiffs' assignments of error assail such findings and claim they are not supported by, but are contrary to, the evidence and the preponderance thereof.

One of the principal questions which divides the parties is whether or not the operation of defendant's pumps has or could affect the flow of those of plaintiffs' wells from which the water is impregnated with iron or sulphur or both. Plaintiffs claimed and offered evidence tending to show that the flow of their wells was lessened by reason of the operation of defendant's pumps without regard to whether fresh or mineral water came from the wells. Defendant claimed and offered evidence which tended to show

that the operation of its pumps had not and could not affect the flow of those of plaintiffs' wells, the water of which contained mineral. The greater part of the evidence which is brought here for review relates to that issue. There is no conflict in the evidence as to these facts: Defendant's wells from which it pumps water are located on lot 7, block 134, plat A. The water from those wells is free from mineral. There is likewise no mineral in the water coming from the wells of the following plaintiffs: William H. Kingdon, located on lot 8, block 118, plat A; John E. S. Tomlinson, located on lot 1, block 118, plat A; James D. Morris, located on lot 2, block 118, plat A; Maine Stauffer, located on lot 4, block 118, plat A; Anna Catrine Nielsen, located on lot 3, block 118, plat A; heirs of Angnes Holmes, located on lot 2, block 118, plat A; J. W. Haslam, located on lot 3, block 118, plat A; Rosetta Solomon, located on lot 1, block 118, plat A; Mark Kartchner, located on lot 6, block 118, plat A; John Solomon, located on lot 1, block 117, plat A; John Holmes, located on lot 5, block 118, plat A. The water of all of the other wells owned by plaintiffs contained mineral. Chemical analyses were made of the waters received from a number of the mineral water wells. The analyses showed considerable difference in the amount of mineral in the water of various of plaintiffs' wells, some containing more than two grams of sulphur per liter and others containing less than one-fifth of a gram of sulphur per liter. The wells in which the water contained sulphur, with two exceptions, are from 50 to 100 feet deeper than the fresh water wells. A number of landowners upon whose lands are fresh-water wells in the immediate vicinity of the wells here in litigation are not parties to this action. The amount of water used by such landowners does not appear. It does appear that an ice company maintains an ice plant on its lands. Wells have been driven upon the ice company's land and in the summertime considerable fresh water has been pumped from those wells for the manufacture of ice. During the course of the trial, sitpulations were en-

tered into between plaintiffs and defendant whereby it was agreed:

"That each of the plaintiffs owns and is entitled to the possession, use and beneficial enjoyment of any and all subterranean waters, whether directly beneath the described land, or otherwise, which attach or are appurtenant to, or derived from the ownership of the parcels of land described opposite the names of the respective plaintiffs in Schedule 'A,' hereunto attached and by reference made a part of this stipulation.

"That the aforesaid rights include the enjoyment and consumptive use of such waters upon said particularly described parcel of land to which they are appurtenant and/or elsewhere within or without any subterreanean basin or basins in which said property is situated, so long as the rights of the owners of other property within the artesian basin area are not injured by the conveyance of said water without the area of said basin.

"That the defendant, Utah Oil Refining Company, owns and is entitled to the possession, use and beneficial enjoyment of any and all subterranean waters, whether directly beneath the described land, or otherwise, which attach or are appurtenant to, or derived from the ownership of the parcels of land described in Schedule 'B', hereunto attached and by reference made a part of this stipulation.

"That the aforesaid rights include the enjoyment and consumptive use of such waters upon said particularly described parcels of land to which they are appurtenant and/or elsewhere within or without any subterranean basin or basins in which said property is situated, so long as the rights of the owners of other property within the artesian basin area are not injured by the conveyance of said water without the area of said basin.

"That on the trial of this cause the Court may consider that the plaintiffs and defendant have proved such ownership to such waters by competent evidence without receiving any evidence or testimony with respect thereto.

"Each of the plaintiffs and the defendant reserves the right to offer proof of the ownership in him or it of subterranean waters appurtenant to other lands overlying the artesian basins described in the complaint and answer herein on file."

Exhibits A and B referred to in the stipulation contain a description of various tracts of land. With respect to the land described in Exhibit B of the above-quoted stipulation, it was further stipulated:

" * * * That all of the underground percolating and subsurface water underlying and found in all of the tracts of land described in Schedule 'B', except those tracts of land hereinafter described by metes and bounds, was used for beneficial purposes by defendant's grantors and their predecessors in interest."

Then follows a description by metes and bounds of a number of tracts of land. It is made to appear that the defendant was not the owner of all of the lands described in Exhibit B, but that prior to the trial it had purchased the right to the use of the subterranean waters of such lands as were not owned by it at a cost of more than $200,000. The subterranean water rights so purchased by the defendant were over the area where fresh-water wells have been procured. As defendant purchased subterranean water rights underlying a tract of land, any artesian wells that might be flowing thereon were plugged up.

Following is a summary of the evidence touching the questions which divide the parties: Numerous of the plaintiffs testified at the trial. They also called other witnesses who were familiar with plaintiffs' premises and the wells which had been driven thereon. It appears from their testimony that for many years prior to 1920, plaintiffs and their predecessors in interest used the water from their artesian wells to irrigate their lawns, trees, and gardens, and to furnish culinary water for their homes; that since 1920, when defendant's wells were driven, the flow of plaintiffs' wells, both fresh and mineral, have decreased; that in some instances their wells have dried up making it necessary to secure water from the city water system; that in other instances the water flowing from their wells has so lessened as to render the available water insufficient to supply their needs; that in still other instances the pressure of the water has so weakened that it will no longer flow to the second story of some of their buildings.

Hubert G. Hall, one of plaintiffs' witnesses, testified that he was a graduate of the University of Utah in 1918; that while at the University he devoted some time to the study

of geology; that after his graduation he served one year in the United States Army; that since serving in the Army he has been engaged in engineering work, principally that of hydraulic engineering; that underlying the territory in question there is at least one, and probably two, artesian water basins, one of which basins contains fresh water and the other mineral water; that an artesian water basin is formed by a pervious stratum of earth being incased between two impervious strata, one above and one below the pervious stratum; that the strata of earth are not horizontal but slope from the mountains into the valley; that water percolates into the pervious stratum at its higher elevation, becomes impounded between the two impervious strata so that when the impervious stratum above the water is tapped by a pipe the water comes out of the pipe in the form of an artesian well; that from 1920 to 1928 he had under observation the wells involved in this litigation; that during that period of time the height at which artesian wells would flow out of the pipes was reduced on an average of 10.5 feet; that the wells near those from which defendant has been pumping water have been affected more than those which are farther away; that at defendant's wells the height at which water will flow out of the artesian wells has been reduced 16.6 feet; that in his opinion, if there are in fact two water basins in the territory in question, such basins are connected so that an excessive drawing of water from one basin lessened the pressure and amount of available water in the other basin; that assuming that there are two basins, the connection between them may have been brought about by a disturbance of the earth such as faulting or the operation of heavy trains over the surface of the earth; that the difference in the mineral content of the water in the various wells in the mineral area is in his opinion caused by either water from the fresh water area finding its way into the mineral area, thus diluting the mineral water, or if there be but one basin, the mineral content or the absence thereof in the water comes from the

soil through which the water moved from its source to the place where it is brought to the surface of the earth in the form of artesian wells; that by the operation of defendant's pumps it is possible to draw from its wells 808 gallons of water per minute; that all of plaintiffs' wells would not flow to exceed 75 gallons per minute, and that from his observation all of the plaintiffs were not using at the time of the trial more than 15 gallons of water per minute from their wells; that he had at various times made observations of the amount of water used by the defendant and that such amount varied from a flow of 2.15 cubic feet per second of time to a flow of 1.47 cubic feet per second of time; that the pressure of the sulphur water wells was less than the pressure of the water in the fresh-water wells; that he had computed the area of the land owned by the plaintiffs and the defendant; that the area of plaintiffs' lands amounted to 568,400 square feet and the area of defendant's land amounted to 2,590,000 square feet; that assuming defendant used 808 gallons per minute and plaintiffs used 15 gallons per minute, then and in such case, of the total amount of water consumed by plaintiffs and defendant, the plaintiffs consumed 1.8 per cent and defendant 98.2 per cent; that in his opinion the cause of some of the plaintiffs' wells drying up and the pressure being reduced during the period from 1920 to 1928 was that more water was taken from the basin or basins supplying plaintiffs' and defendant's wells than found its way into such basin or basins; that if the basin or basins were allowed to fill up and if thereafter the amount of water taken from the basin or basins was limited to the amount which entered the basin or basins, plaintiffs' wells would again flow as they were wont to do.

Charles Bishop testified that he had resided in the vicinity of where the wells in controversy are located for about forty years during which time he had driven about 700 wells; that there have probably been 750 wells driven in that district; that water was encountered in the wells im-

mediately below a hard impervious stratum of the earth; that he did not know how many wells there were in the district now, but that a great number have been shut off; that the amount of water that could be secured by drilling a well in recent years was much less than it was in years past; that prior to about seven years ago, a flow of from 20 to 35 gallons per minute could be secured from a 2-inch pipe, but that at the time of the trial a flow of 6 to 7 gallons per minute was about all that one could get from a 2-inch pipe; that the pressure of the water in the wells had considerably reduced in recent years; that cleaning out the old wells does not seem to increase the flow to any considerable extent; that in every instance the east side of the basin produces fresh-water wells; that west of 5th West and north of 7th North the wells contain sulphur; that the fresh water is generally encountered at a depth of from 60 to 100 feet and the sulphur water at from 135 to 170 feet; that a number of years ago there were numerous springs in that district; that after the wells were driven some of the springs dried up; that the pressure in the wells on the east side lessened as wells were driven on lower ground to the west; that he did not know if the driving of more fresh-water wells had a tendency to dry up the sulphur wells; that the sulphur wells extended from the Warm Springs in the shape of a half moon down to 6th and 7th West streets and thence easterly into Liberty Park where a sulphur well is located; that he did not know but he believed the fresh and sulphur water had a common source in City Creek Canyon, and the sulphur was absorbed by the water from the ground through which it passed.

Dr. F. J. Pack testified at considerable length on behalf of the defendant. Following is a brief summary of his testimony: That he was graduated from the University of Utah with a major in geology; that he had a master's and doctor's degree from Columbia University, and had been a professor of geology in the University of Utah since 1907; that he was a fellow in various geological societies; that he

had devoted considerable time to the geology of Utah and the territory involved in this litigation concerning which he had written articles, one of which was published in the American Journal of Science. He testified somewhat in detail as to the geology of the Great Basin, the Wasatch Fault, and Lake Bonneville. According to his testimony, the Wasatch Fault extends from Nephi northward for a distance of about 150 miles to a point beyond Ogden; that in the formation of the fault the Wasatch Mountains form the upthrown or easterly block and the valley the downthrown or westerly block; that the upthrow was elevated 10,000 feet above the downthrow; that locally the Wasatch Fault passed immediately below Fort Douglas, thence it swings to the northwest and passes through the northwesterly corner of the Salt Lake City Cemetery; continuing to the west and north it passes about the length of two blocks north of the State Capitol building, from which point it swings again to the north and passes within 200 feet east of the Municipal bath house and then assumes a general northerly and slightly westerly direction until it reaches the point of the mountain at Beck's Hot Springs, after which it extends slightly to the northeast into and beyond Davis county; that as the upthrown block raised above the downthrown block at the Wasatch Fault, erosion began from the upthrown block down onto the downthrown block, and that such erosion is still going on; that the movement of the Wasatch Fault began at least one million years ago and has continued intermittently from that time until practically the present time; that before the beginning of Lake Bonneville, the Great Basin was characterized by an arid climate; that thereafter the climate changed, precipitation increased, and the temperature was reduced, resulting in increasing the size of the then existing lakes; that the water which formed Lake Bonneville rose until there was a balance between precipitation and evaporation; that there is indisputable evidence of the existence and extent of Lake Bonneville; that the lake reached a point about 1,000 feet above

the present level of Great Salt Lake; that whenever the lake level remained at a fixed height it carved terraces from the mountain sides, the size of such terraces being indicative of the length of time that the lake remained at a given height, the larger terraces being at an elevation where the lake remained for the longer period of time; that at one time some of the water of Lake Bonneville flowed to the north through Marsh Valley, Port Neuf river, Snake river, and the Columbia river, into the Pacific Ocean; that during the existence of Lake Bonneville, swollen streams brought vast quantities of sediment from the Wasatch Mountains and deposited it over the floor of the lake forming deltas where the water entered the lake; that during the time the terraces and deltas of Lake Bonneville were being formed, the prevailing winds came from the northwest as shown by an abundance of evidence; that these winds caused the water of the lake to carve larger terraces on the northwesterly side of the mountains and caused the streams flowing from the west side of the mountains to veer towards the south and to form deltas which likewise tend towards the south; that during the time of the existence of Lake Boneville many deltas were built at the mouths of streams which flowed into the lake from the east; that among the deltas so built up was one at the mouth of City Creek Canyon and another in the neighborhood of Beck's Hot Springs; that the carrying power of a stream, stated mathematically, varies as the sixth power of the velocity; that is to say, a stream is moving at a velocity which we may call unit, and is capable of carrying a particle of a given size, if the velocity of the stream is doubled, it is capable of carrying a particle sixty-four times as large, or, conversely, if the velocity of the stream is reduced by one-half, it is then capable of carrying a particle only one sixty-fourth times as large as before; that the laws governing the transporting power of streams results in the formation of three well-defined sets of beds in deltas, foreset, topset, and bottomset beds; that the foreset beds are the

depositions of the streams as they enter the lake and are parallel with the bottom of the lake floor, the topset beds are deposited near the mainland and above the level of the quiet body of water, and the bottomset beds are strewn over the floor of the quiet body of water; that a typical foreset bed will rise to the level of the surface of the water where it consists of coarse grained material and will range from that point lakeward, the materials becoming fewer and thinner until it disappears at a knife's edge and the material composing it will change from coarse grained material to fine materials and then into fine grained impervious sediments; that deltas thus laid down almost exclusively control the occurrence of underground water which does not occur in haphazard manner; that the water under consideration is encountered in a system of deltas laid down during Lake Bonneville's time; that underground water is commonly classified as being either meteoric or magmatic; that the fresh water involved in this litigation is meteoric and comes from the City Creek delta; that the floor of City Creek Canyon is pervious and part of the water in that canyon finds its way into the City Creek delta and supplies the water which comes from the freshwater wells involved in this controversy; that the water which contains sulphur comes from the Warm Springs delta; that it is magmatic or of deep-seated origin. It rises in the Wasatch Fault from depth and when it encounters the loose alluvial gravel of the Warm Springs delta it spreads out and supplies those wells involved in this action which flow water containing sulphur; that when the City Creek delta and the Warm Springs delta were being formed, the water between the two deltas was without velocity so that only fine impervious silt was deposited where the two deltas came together; that the place where the two deltas came together may have changed slightly from time to time because of a change in the relative size of the streams which were making the deltas and thus it might be possible to drill a well near the place where the two deltas coalesce

and alternately secure fresh water and mineral water, but the water of a given delta will be exclusively fresh or exclusively sulphur. Under no circumstances can the same delta produce a combination of the two waters because the law of the diffusion of waters makes a given body of water more or less uniform; that the waters of City Creek have been more or less confined to culverts and pipes during the past fifteen years; that such utilization of City Creek water by Salt Lake City very materially reduced the amount of water that formerly would percolate into the City Creek delta, and hence has reduced the amount of water which supplies the fresh water wells here in controversy; that the dividing line between the City Creek delta and the Warm Springs delta can readily be seen on the surface of the earth and it coincides almost perfectly with the dividing line of the freshwater wells and the sulphur water wells; that the disparity of some 30 or 40 feet in the depth of the sulphur water wells and the fresh-water wells involved in this litigation is plainly indicative of the fact that they do not come from the same delta; that in the Warm Springs delta the water is sulphurous and warm near where it enters the delta at the Wasatch Fault and necessarily becomes cold in the extreme ends of the fingers of the delta; that when the two deltas interfinger or coalesce, the sediments are necessarily fine grained and therefore the water from one delta cannot pass into the other; that the difference in the sulphur content of the sulphur water wells may be accounted for by the fact that most of the sulphur in those wells is in the form of hydrogen sulphide which under ordinary conditions is a gas; that as the water moves through the earth from its source some of the hydrogen sulphide escapes, the amount depending on the distance it moves and the porosity of the soil through which it moves, and also that hydrogen sulphide is one of those substances that is chemically active, and during the long period of time the water has been confined under the ground there may well have occurred a chemical change.

Phillip S. Showell, a witness called by the defendant, testified that he had made tests of the static heads or pressures of various wells which are involved in this controversy. The wells so tested were both sulphur and fresh. The data which he secured as a result of such tests was received in evidence.

C. J. Ullrich was called as a witness by defendant. He qualified as an engineer experienced in the science of hydraulics. He testified that in his opinion the data secured by Mr. Showell indicated that the fresh-water wells and the sulphur wells here in question had entirely different sources of supply because there is a difference in the average elevation of the water in the sulphur water wells and the fresh-water wells, and also because the fluctuation of the static head in the sulphur water wells has varied over a far wider length than in the fresh-water wells.

A more detailed statement of the evidence touching the question which divides the parties to this litigation would unduly lengthen this opinion. The foregoing summary of the evidence will suffice to indicate the conflicting theories advanced by the parties and the nature of the evidence given in support of the respective theories. After a careful consideration of the testimony, we are of the opinion that the finding of the learned trial judge that the two artesian water basins are not connected should not be disturbed. There being no connection between the water which supplies defendant's fresh-water wells and the sulphur water wells owned by some of the plaintiffs, it follows that such plaintiffs as own sulphur water wells are without cause to complain because defendant operates its pump and uses the water from its wells.

The parties are apparently agreed that the water which supplies defendant's wells and plaintiffs' fresh-water wells comes from the same artesian water basin. The evidence without conflict supports such theory. At the outset of our discussion of the phase of this case which concerns fresh-water wells, it should be noted that none of the parties to

this litigation challenge the doctrine announced by this court in the cases of *Horne* v. *Utah Oil Refining Co.*, 59 Utah 279, 202 P. 815, 31 A. L. R. 883, and *Glover* v. *Utah Oil Refining Co.*, 62 Utah 174, 218 P. 955, 31 A. L. R. 900. Plaintiffs make no claim to any superior right to the water of the artesian basin which supplies their wells and the wells of the defendant by reason of any prior appropriation or use of such water. On the contrary, it was stipulated at the trial that the plaintiffs and defendant are the owners and entitled to the possession, use, and beneficial enjoyment of all subterranean water which attaches or is appurtenant to or derived from the ownership of their respective parcels of land, and that such water may be used either upon the lands to which it is appurtenant or elsewhere so long as the rights of the owners of other property within the artesian basin are not injured by the conveyance of water without the basin. It was held in the case of *Glover* v. *Utah Oil Refining Co.*, supra, that the mere fact that an owner of a water right within an artesian district uses it beyond the boundaries of that district does not give another owner of the water right within the district cause to complain. Before such other owner of water may be heard to complain, it must be made to appear that he is injured because the water is used without and not within the artesian basin. There is no evidence in this record that any of the water which is drawn from the basin ever finds its way back into the basin. If defendant's refining plant were located within instead of without the basin, and the nature and extent of the use of its water remained the same, plaintiffs would be neither injured nor benefited by the change.

If plaintiffs are entitled to prevail in this proceeding, it must be because defendant has used, and threatens to continue to use, more of the water of the common artesian basin than it is entitled to use. This is not a proceeding to quiet plaintiffs' title to the water of the basin, or to determine the amount of water that plaintiffs

and defendant are entitled to draw from the basin. If the purpose of this proceeding was to accomplish that end, the evidence offered and received at the trial was not such as to enable the court below nor this court to determine that question. There is evidence tending to show that under the doctrine of correlative rights as announced by this court in the *Horne Case,* supra, the defendant has been receiving more water based upon its surface rights than has been received by some of the plaintiffs based upon their surface rights, but it also appears that many others were drawing water from the same basin that supplied the wells of plaintiffs and defendant. The record is silent as to the probable total amount of water in the basin available for use. It is silent as to the probable total surface area overlying the basin and is likewise silent as to the probable amount of water that was being drawn from the artesian basin by users who are not parties to this suit. The legal effect of the stipulations heretofore quoted in this opinion is that plaintiffs and defendant have a common interest analgous to that of tenants in common in and to the water of the artesian basin underlying their lands. So far as appears, the defendant may be using no more or even less water than it is entitled to use and that the injuries concerning which plaintiffs complain have been caused by the excessive use of the water of the common artesian basin by other users. It having been stipulated that the defendant owns a part of the waters in controversy, there is no presumption that it has taken or will take more than its reasonable share. Before plaintiffs are entitled to an injunction or judgment for damages, they must establish by a preponderance of the evidence that they are not receiving the water to which they are entitled, and that the defendant by the acts complained of has wrongfully deprived them of such water. *Hudson* v. *Daily,* 156 Cal. 617, 105 P. 748; *Coleman* v. *LeFranc,* 137 Cal. 214, 69 P. 1011.

It is also urged on behalf of the plaintiffs that the pressure of the water in their wells has been materially reduced

to their damage by the wrongful acts of the defendant. The reduction of the pressure, however, is but an incident to the excessive use of the water of the basin. According to the testimony of plaintiffs' witness Hall, if the artesian basin was permitted to fill up and thereafter the amount of water withdrawn from the basin was limited to the amount of water which entered the basin, the pressure of the water in plaintiffs' wells will, in a great measure, return. Upon this record, the court below was amply justified in finding that it "cannot find the extent or limits or areas of said basin (the basin supplying the fresh water wells of plaintiffs and defendant), nor the owners of the lands over-lying said basin nor the amount of sub-surface, percolating or artesian waters each of said owners is entitled to." In the absence of such facts, the court below properly refused the injunction prayed for by plaintiffs.

The judgment is affirmed without prejudice, however, to the rights of the plaintiffs who own fresh-water wells to bring another proceeding to determine the amount of water to which they and the defendant are entitled, and, if the facts are such as to justify injunctive relief, to enjoin the defendant from using more than its share of the water so determined. Respondent is awarded its costs.

FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.

STRAUP, Chief Justice.

I concur in the result. I, however, do not concur in all that is said on the subject of burden of proof. In the proceedings before the trial court it was stipulated that the plaintiffs and the defendant "each owns and is entitled to the possession, use and beneficial enjoyment of any and all subterranean waters" in question, and "that on the trial of this cause the court may consider that the plaintiffs and defendant have proved such ownership to such waters" without receiving any evidence with respect thereto.

The judgment of the court below denying injunctive relief is affirmed on the theory that it was not sufficiently shown what quantity of water each was entitled to, or that the waters pumped from the basin by the defendant took or drew waters to which the plaintiffs were entitled; that the action was not one to quiet title or to determine what quantity or amount of water each was entitled to draw from the basin; and since the defendant by stipulation was entitled to some water, it should not be enjoined from drawing any or all water drawn by it from the basin, and thus the judgment denying injunctive relief is affirmed, without prejudice, however, to the rights of the plaintiffs to bring another action or proceeding to determine the amount of water to which they and the defendant are entitled, and if the facts warranted, to enjoin the defendant from using more than its share of the water. If by an affirmance of the judgment, a dismissal or final determination of the action is intended, as it seems to be, and if by the reservation as to a new action, it is intended to avoid any question of res adjudicata if and when a new action or proceeding is brought, I think the reservation is merely gratuitous and will not accomplish the purpose for which it is intended; for that, if a new action is brought whether what here is adjudged is res adjudicata is dependent upon what was here involved and decided or could have been presented and decided, and what is involved and presented for decision in the new action. That may not be prejudged until the matter arises and is presented.

However, as to burden of proof. We have here a situation where all parties concerned, plaintiffs and the defendant, assert rights in and to a common source of underground or subterranean waters, a case where each is an actor claiming a certain quantity or amount of such waters. In such case and in the determination of such issues, I think each claimant is an actor and, as such, has the burden of proof to establish not only his right, if disputed, but also the amount or quantity of water to which he is entitled. If the one has no paramount rights over the other, and if there be suffi-

cient waters in the basin to supply all entitled thereto, neither can complain of the other, unless of a taking of an excessive share or amount thereof to the injury of a complainant; and if the common source or basin is insufficient to supply all equally entitled thereto, then each to share ratably in proportion to the quantity or amount to which each is entitled.

Where one has tapped and used a flow of underground percolating waters or waters from a basin, and made a beneficial use of them, and another thereafter in close proximity taps and pumps a flow whereupon the flow of the first user ceases, or is materially diminished, and the attending circumstances are such as to raise a reasonable inference that the waters drawn by the subsequent user are waters of the flow of the first, the burden or duty of going forward shifts to the subsequent user to show that the waters drawn by him are not waters of the first or the cause of a diminution thereof.