## STATE v. JOHNSON.

No. 5964.   Decided October 26, 1938.   (83 P. 2d 1010.)

*J. A. Melville* and *O. A. Tangren,* both of Salt Lake City, for appellant.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

LARSON, Justice.

Defendant was convicted in the District Court of Millard County of the crime of murder in the second degree, and appeals. The facts pertinent to the appeal are as follows: Appellant on the night of February 1, 1937, gave birth to a baby boy. She testified that she was unattended, although her mother slept in the same room and her brother in an adjoining room. It was sub-zero weather; there had been no fire in the house since morning except for a few minutes to prepare the evening meal. It was a frame house; the room was uncarpeted and there were cracks under and about the door. The baby came about 10:30 or 11:00 o'clock at night. She had not told her mother of her condition and did not call her mother when she became ill. The baby "just cried a little; that she was in great pain and swooned; she was unconscious for an hour or more. When she regained consciousness she felt for the baby. It lay in the bed just where it was born in all the vernix, caseosa, and with part of the placenta attached. She put her hand over its mouth to see if it was breathing and then put her hand over its heart but could feel no beat. She left the baby under covers until the next evening when she carried it in a pasteboard box to a public toilet in the park and there deposited it." The above facts, as testified to by appellant, are not essentially in dispute. There is no doubt that she gave birth to the baby and that the baby when dead was by her thrown into the toilet. To maintain its case the state relies on alleged confessions of the appellant. She contends that the alleged confessions were not such; that if given, they were involuntary and therefore inadmissible; and that at no time was there or is

there any proof of the corpus delicti independent of the confessions. Here are presented the three questions involved in this appeal. Were they confessions? Were they voluntary? Was there independent proof of the corpus delicti?

Evidence of alleged confessions was furnished by Dr. Wright and by Messrs. Turner and Peterson. Dr. Wright testified that on February 4th defendant came to him for an examination. She said that the sheriff had found a baby in Deseret and she had been accused of being its mother and she wanted to prove that she had been menstruating regularly and was then doing so. The doctor testified he examined her and told her his examination showed she had recently given birth to a baby. Dr. Wright was the County Physician. He had already heard of finding the body of a baby in the toilet. He confronted her with the fact that such was her baby. She first denied having a baby and finally admitted that the baby found was hers. He testified further as follows:

"I said: 'What happened to it, Fern, what caused its death?' 'Did you do something to cause the baby's death?' She said: 'Yes, I did.' I said: 'What was that?' She said: 'I put my hand over the baby's mouth and nose and excluded the air and caused the baby's death in this manner.'

"Q. Did she say why she had done it? A. Yes sir.

"Q. Why did she say? A. Well, she said that she couldn't go through with any more, she had all the children she could take care of, she had more than she could do justice to, she couldn't raise any more children. Further, she said she didn't want her mother to know anything about it. She said that those were practically the reasons why she had done as she had."

On cross-examination he testified she did not say she had put her hand over the baby's nose, but that in illustrating she put her hand over her own mouth and nose, which gave him that impression.

The statements testified to as having been made to Dr. Wright if given the interpretation placed upon them by him were confessions. They involved an admission of guilt

of the criminal act. They were admissions of the whole crime and not merely of some part thereof which, together with independent facts, would tend to prove the guilt.

A confession admits the commission of a crime, that is, admits all the elements of the crime including guilty participation. An admission on the other hand admits only some part or elements of the crime, but not the guilt, ■■ and leaves the rest including guilty participation to be proved by other evidence.

Were such confessions voluntary? Appellant testified that the doctor told her that if she didn't tell the truth about it she would "be brought into court and cross-examined." This the doctor denied. As to whether this amounted to a threat which put her in fear or a promise by implication that if she admitted the crime she would escape something ■■ which she dreaded, so as to obstruct the voluntary and free action of her mind and will, was for the determination of the trial court or the jury under proper instructions. In determining whether a confession was voluntary there must be taken into consideration the age and intelligence of the witness, the place and conditions under which the statement was made, the circumstances that invoked the conversation, as well as the nature, content, and import of the statement itself. The court held the statement voluntary and we find no error therein.

The next statement of defendant to Dr. Wright alleged to be a confession was made on February 25th in connection with his obtaining a death certificate. The testimony of Dr. Wright in that regard is as follows:

"Q. Tell just what she told you at that time with reference to the cause of the death of this infant. A. She said that the baby was born there at her home in Deseret on the night of February 1 at about 10:00 or 10:30 P. M., she was not sure of the exact time. She said after the baby was born she put her hand over the baby's mouth to exclude the air, suffocate it. When she was sure that the baby was dead she pushed it down under the bed clothes and covered the baby up.

■                    ,

"Q. Did she tell you at that time what disposition was made of the body of the baby? A. Yes, she said the baby later was taken out to this toilet in the park."

The defendant denied she had told the doctor on either occasion that she had killed the baby.

There is testimony of her having told Turner, the deputy sheriff, that she killed the baby. Her alleged admissions came after considerable importuning and with intermittent spells of crying and partial hysteria. She was upset. Finally after a number of denials he says she nodded her head, "yes," in answer to his question as to whether she killed the baby. No useful purpose would be subserved by setting out in detail the testimony in that regard. It is for the trial judge to determine whether confessions were voluntary. If he concludes that they were, and there is conflicting evidence, he should submit the issue as to whether they were voluntary to the jury, instructing them that they should first determine that question before they consider the confessions as evidence against the accused and only consider them as evidence if they conclude that the confessions were voluntary. If the judge determines that they were not voluntary they of course should not be admitted. Likewise, if he concludes they were voluntary, and there is no evidence that they were not voluntary or the circumstances such as not to raise any doubt as to their voluntariness, he should not put the issue to the jury. *State* v. *Bates*, 25 Utah 1, 69 P. 70; *State* v. *Johnson*, 76 Utah 84, 287 P. 909; *State* v. *Wells*, 35 Utah 400, 100 P. 681, 136 Am. St. Rep. 1059, 19 Ann. Cas. 631; *State* v. *Dunkley*, 85 Utah 546, 39 P. 2d 1097. *State* v. *Romeo*, 42 Utah 46, 128 P. 530.

As stated by Mr. Justice Wolfe:

"A confession is involuntary where the installation of fear or a promise of benefit, related to the legal consequences as regards accused, conveyed by another for the purpose of obtaining the confession, has so acted on the will of the confessor as to fetter the freedom of choice on the matter of whether he or she should confess. The actu-

ating element which must move the will of the accused to confess is an inherent freedom of choice not influenced by fear or hope induced by another for the purpose of obtaining the confession. Whether such freedom of choice has been so interfered with by the conduct of another is a question of fact to be determined from the evidence."

We think the trial court is in a better position to determine whether advantage was taken of a defendant to obtain a confession in a way not countenanced by the law. And we do not think the court erred in holding that the confessions were not involuntary and admitting them in evidence.

We come now to the crucial question: Is there sufficient independent proof of the corpus delicti to render the confessions admissible in evidence? It is clear to our minds that there is not such independent evidence. We concede at the outset that such independent evidence need not conclusively show the corpus delicti. We also concede that in deliberating on a verdict the jury may consider the confessions in evidence, not only in determining the question of defendant's guilty participation in the crime but also in determining if the crime was actually committed. In other words, when a cause reaches the jury it bases its verdict upon a consideration of all the evidence before it and may consider any fact in determining any point or question, in so far as such fact may relate to such point or question. The question here is not one as to the weight or consideration of a purported confession in arriving at a verdict but a question of a procedural nature before the court. We adhere to the doctrine that there must be independent proof of the corpus delicti before the confession can be received for the consideration of the jury, and that corpus delicti, as so used in a homicide case, involves two elements: The fact of the death, and the fact that it was brought about or induced by a criminal agency. As indicated above, these facts need not be conclusively proved and established beyond a reasonable doubt before a confession may be received in evidence, for a literal application of such a rule would require the jury as finders of the facts to first

render a special verdict as to these matters and then hear evidence as to the identity of the guilty agent and find another verdict on that score. The rule we deduce from the way it is applied in the overwhelming majority of the cases is that there must be evidence, independent of the confession, corroborative thereof, consistent therewith, forming a basis or foundation for the confession, and tending to confirm and strengthen it, before the confession may be considered by the jury as evidence of guilt. The trial of a criminal cause requires the State to prove three facts before it is entitled to a verdict in its favor. It follows therefore that there must be evidence of those facts before the State is entitled to go to the jury. Such facts are: (1) That a wrong, an injury, or a damage has been done; (2) that such was effected by a criminal agency, i. e., without right or by unlawful means; (3) that the accused perpetrated the wrong, or aided or abetted therein, i. e., that accused was the guilty agent. A confession as used in criminal law is a statement or admission by a person that he was the perpetrator of a criminal act, or particeps criminis therein. It therefore serves as evidence, and if believed, as sufficient proof of the third point of proof, the identity of the guilty agent. It may also according to the language used be evidence of either or both of the first and second points to be proved. But the law for reasons which immediately appear has wisely declared that there must be independent evidence of the first and second points, commonly called the corpus delicti. An understanding of the proper meaning and application of this rule will be evident from a consideration of its history and philosophy—the reason for the rule. A trial of a criminal cause is an investigation conducted according to due and prescribed order to determine whether or not the accused (defendant) is the person who perpetrated a specified criminal act, that is, was he the guilty agent in a public offense. The law says that before such inquiry should be made, before defendant be called upon to face such an issue, the corpus delicti must first be shown.

By the corpus delicti is meant the body or substance of the offense, the existence of a criminal fact. Unless such fact exists there is nothing to investigate. There is no foundation upon which to build the evidential structure showing who was the perpetrator. You must build a stage before the players can act upon it. Otherwise, you have nothing upon which the inquiry can concentrate. You have nothing about which you can inquire. But once a criminal fact is established, upon which the investigation can concentrate, you have something about which, and into which inquiry can be made with judicious approach and direction. With such fact as a foundation we may build a superstructure by bits of evidence gathered from here or there, direct or circumstantial, keeping the same always substantially within the lines of the foundation, and from which we derive our rules of evidence as to relevancy and materiality. The reasoning founded upon such a foundation may be sound and reliable. But a structure without a factual foundation under it, and the reasoning founded upon it and drawing its force from it, will be dangerous, fallacious, and unreliable. As the superstructure ascends and the weight grows the weakness of the foundation is more and more intensified, and the circumstantial evidence built upon a criminal fact, not shown to have existed, becomes as suspicions expand and extend, weak and indecisive. If a person is murdered a motive therefor may be of paramount importance, and in all cases is significant, but of what probative force is a motive for a murder when there is no murder? The existence of such motive might well be true and yet be fallacious and deceptive. Such matters gain their probative force only upon condition that there is a criminal fact they serve to explain. It is not necessary that either leg of the corpus delicti be established or proved by eyewitnesses before a confession can be received in evidence. A dead body is found with the skull mashed in, or finger marks upon the throat with the bulging, protruding eyes and tongue and dark colored lips of the strangled person, or a bullet hole in the brain, under circumstances which

exclude any inference of accident or suicide. There we have direct evidence of the death and cogent and irresistible proof of the violence; the one the cause, the other the effect, establishing the apparent existence of a criminal fact demanding an investigation. This, the corpus delicti, raises two other questions for inquiry: Who is the deceased, and who caused him to die? These may now be established by any kind of competent evidence which convinces the conscience of the jury, and because a basis has been furnished upon which inferences may stand and presumptions have strength, they may be proved by the confession of the accused.

Elementary books sometimes state that confessions alone are sufficient to convict, but we doubt that any court would permit a conviction on an extrajudicial confession alone without some proof that a crime had in fact been committed, or some independent evidence fortifying and corroborating the confession. The law requires proof sufficient to satisfy the sound mature reason and judgment beyond a reasonable doubt, and nothing short of this will justify a conviction. Blackstone, in speaking of confessions not made upon due caution and deliberation, says: "They are the weakest and most suspicious of all testimony; ever liable to be obtained by artifice, false hopes, promises of favor or menaces; seldom rendered accurately or repeated with due precision; and incapable in their nature of being disproved by negative evidence." 4 Blackstone Commentaries, 357-9. Experience has shown that confessions sometimes turn out unfounded; that persons for the thrill or for publicity, or from mental derangement often confess the commission of crimes never committed, or which investigation shows they did not commit, as illustrated by persons posing as kidnappers in an effort to collect the ransom money. The weak, to avoid apparent impending peril and under the force of surroundings, or imaginary dangers, have been induced to state untruths. So too one often confesses or claims the commission of a crime he did not commit to avoid investiga-

tion into his own, or some other person's activities or history, or to avoid the prosecution of some one on another charge.

Confessions are necessarily weak or strong evidence according to the circumstances attending the making and proving of them; and we think the only safe general rule is to require some other evidence corroborative of their truth.

Proof that a crime has been committed by some one is certainly corroborative of a confession by a defendant that he committed the crime, for it establishes the existence of a fact included in the crime confessed and essential to his guilt. So too proof of facts which grow out of the crime or which would probably not have existed had the crime not been committed corroborate it, and increase the probability of its truth. This too even though such facts may have been discovered from the confession. Thus where a person confesses to a homicide and says he buried the body at a certain place, the finding of the body or the bones thereof at such a place is corroborative of the confession. It increases the probability of its truth. So too where the personal goods of deceased are found in the possession of the accused. But such corroborative evidence must consist of facts or circumstances appearing in evidence independent of the confession and consistent therewith, tending to confirm and strengthen the confession. Mere confession that the crime charged has been committed, unless such confession be judicial or in open court, will not justify a verdict of guilty without proof aliunde the confession that a crime has been committed, or proof of some fact or circumstance otherwise confirmatory of the confession. It is the mere naked confession, uncorroborated by proof of other circumstances outside of the confession inspiring belief in the truth of the confession that is insufficient to convict, and the corroborating fact or facts need not independently of the confession conclusively prove the corpus delicti.

What proof is there in the instant case, independent of the confession itself, corroborating or tending to prove the con-

fession, that is, tending to show that the baby died from violent or unlawful means? Such evidence as there is may be listed under three headings: (a) The fact the baby was dead, shown by discovery of its body; (b) the fact that defendant disposed of the body by dumping it in the privy; (c) the testimony of Doctor Wright relative to his examination of the body. The first does not even justify a remote inference of a criminal agency, for all must die and "death, a necessary end, will come when it will come." It proves the first leg of the corpus delicti, that the baby is dead, but nothing more. The second (b) fact may tend to prove guilty knowledge, that is, the identity of the perpetrator, the same way that evidence of flight may be given to prove with other facts guilty knowledge, but it is and can be no evidence of violent or unlawful death. We come now to the testimony of the doctor. He testified that he made an examination of the corpse on February 8th, seven days after its death; that he examined the baby externally, and there were no evidences visible on inspection of the outside of the body as to how death occurred; there were no marks of violence upon the child; the few scratches on the shoulders were made after death; the child was fully developed with a good color, indicating normal circulation; that he cut a small piece from each lung to see if it would float, which it did, indicating that the child had breathed after birth; that he "examined the heart circulation pretty well and found it normal"; that the heart and lungs were normal. No further or other examination was made, and no details, descriptions or narrations of facts or conditions found, were given although defendant's counsel constantly and continuously insisted that the doctor must state the conditions and facts he found and upon which he based his opinions. In this defendant's counsel was right, and we may say in passing that defendant's objection to the doctor expressing an opinion as to the cause of death, on the record as made, should have been sustained. When however the doctor was asked "Could you determine whether or not it was some external

force that caused death, or some force that stopped the heart or something of that kind?" he replied, *"It was evidently some internal force.* There *were no external signs,* therefore we would come to the conclusion *there was some internal force* that caused death." Strangulation at the hands of another is an external force. Being asked to state his opinion as to the cause of death, the doctor said, "Something came up in the course of the baby's life that caused its manual organs to cease to function as they should. The lungs had functioned. The baby had breathed and had cried. The heart had functioned. Circulation had been maintained for a certain length of time. Certain signs and certain appearances on the body indicated death took place, indicated that life had ceased, and you ask my opinion," and then said in his opinion the baby died of asphyxiation. That is the whole story, every point in his testimony as to the baby and cause of death, every fact he found, narrated or used as a basis for his opinion. We have read and reread the record several times and the only conclusion we can arrive at is that there is in the record no evidence of any indicia of death by suffocation or strangulation, nor of any basis that must exist for opinion evidence as to the cause of death in doubtful cases. The fact that a piece of lung would float merely indicates that it had been inflated, that the child had breathed. It indicates nothing more, and can be the basis for no further opinion. The test was made for that purpose only said the doctor. The fact that circulation had existed merely proves the same point—that the child was born alive. *The doctor stated that he saw no indicia, external or internal, as to the cause of death, and therefore since he found no reason for ascribing death to any other cause he concluded that asphyxiation was the cause of death—not from any evidence of such as the cause of death but from the process of having eliminated other causes that occurred to him as possible. Such evidence not only fails to prove or to suggest or indicate an unlawful or unnatural death but if it even indicates any-*

*thing, it tends to show a lawful or natural death.* (Italics ours.)

Bear in mind the State charges that defendant smothered, suffocated her baby to death by shutting off its breathing. The doctor testified that this body had a "good red color." One of the outstanding indicia of death by suffocation or smothering is a darkening or bluish coloring, especially about the lips and mouth. Other characteristics of death from such causes in infants are cyanosis of the skin, protrusion of the tongue, fluidity of the blood, congestion of the brain, and ecchymosis under the skin and conjunctiva. The bronchii will contain blood stained frothy mucus. Philippon, Infanticide, 78-87; Wharton & Stille's Medical Jurisprudence, Vol. 3, p. 83. Another important characteristic of such death is "taches de Tardieu," being subpleural and subpercardial ecchymosis, or small punctate spots on the surface of the lungs, and distinct against the general background of the lungs. While some medical authorities claim these "taches" may be found where death did not result from "shutting off the air," practically all agree that they are found in all cases of death from such cause, more pronounced in cases of newborn infants. Tardieu, supra, p. 104; Brouardel, supra, p. 178; Philippon, supra, p. 30. None of these signs were found by the doctor. At least none of them appear in his testimony. He negatives their possibility or at least their probability by saying that he found no evidences as to the cause of death, and the description he gives of the body and his observations negative the presence of the conditions or any of them. Other indicia, practically all present in death from such causes, not found by the doctor here, are the congestion of blood in the lungs and in the right side of the heart, and the practical absence of blood in the left side of the heart. Wharton & Stille's Medical Jurisprudence, Vol. 3, p. 79-96, and on page 81 it is said:

"Perhaps the most usual way for the mother to suffocate the child is to cover the nose and mouth with her hand in her attempt to keep it from crying and so betraying its birth. If the woman succeeds in

stopping the cries, she also kills the child. *In these cases the signs of the method used are often distinct.* There are the marks of the finger nails of the mother on the face of the child, around the nose and cheeks. *These lacerations of the skin are especially likely to occur,* as the skin of the child is so slippery from the vernix caseosa, and it is necessary to hold the child fast for five or six minutes to end its attempts at respiration. These superficial lacerations are rarely associated with ecchymosis, and are to be distinguished from accidental excoriations occurring after death by their characteristic size and peculiar angular form as well as by their location around the mouth, nose, and neck. Sometimes the head is held in one hand by the occiput, and the other hand used to cover the nose and mouth. Then there would also be nail marks behind the ears as well as on the face. Owing to the difficulty of holding the child's head, it is not infrequent to have the suffocation supplemented by strangulation, the mother's hand readily grasping the neck of the infant. Here the nail marks are found also on the neck." (Italics added.)

Again it appears that part of the placenta was attached to the body when it was recovered from the privy. There is nothing to show the extent thereof, except it appears that it was probably about the head and shoulders. It happens not infrequently that a child is born in a caul, and although it may be able to breathe it gets insufficient air without removal of the membrane from its face, and the child perishes. Wharton & Stille, supra, p. 90. And these authors on page 95 say:

"It is a fundamental principle laid down by Henke that death by violence is by no means to be inferred from the fact that the child was born alive. Even where marks of death by violence exist, it does not follow that the child was murdered. In the former case it may have perished in consequence of some disease incompatible with its life, or have been suffocated by the caul upon its face, or by its lying in a pool of blood and water, or in a mass of feces, or under a limb of the mother, while in a state of exhaustion or unconsciousness; or, in consequence of there being no help at hand, or of the unwillingness of the mother to betray her condition, the child may be suffocated, or may perish from exposure to cold, etc."

A very interesting review of cases of infanticide is made by the West Virginia Court of *State* v. *Merrill,* 72 W. Va.

500, 78 S. E. 699. While we do not at this time set our approval on all that is said in that opinion, it very instructive reading and the following quotation applies with force and significance in the instant case:

"No marks of violence on the body are shown, from which death could have resulted. The state relied solely on the theory of suffocation or strangulation, due to the coverings over or the string found tied around the neck, and yet showed none of the general evidences of death by strangulation or suffocation, which scientific investigation or even common observation usually disclose. Books on medical jurisprudence are replete with information on this important subject, for the guidance of court and counsel. See 3 Wharton & Stille, Med. Jur. 79-96, on the subject, 'Infanticide'—'Death after Labor;' also the chapter on 'Strangulation,' in the same volume, beginning at page 311. Why was this important phase of the case neglected? There was no evidence even of the most superficial signs of strangulation or suffocation, which the books say are usually present. It is unnecessary to repeat here what the books say on this subject, it suffices to refer to the books, and to say that in this case no attention appears to have been given to it on the trial.

"Of course we do not mean to intimate that conviction would not be justified without the application of all the scientific tests referred to in the books. It is probably true that competent experts could not have been found in the community where this case originated and was tried, but if the books speak truly, many of these evidences are apparent to any one, not requiring much, if any, scientific knowledge.

"Shall courts and juries allow those accused to go to prison on bare suspicion of motive or circumstance when more unerring evidences of crime if any are at hand and either neglected or suppressed? As applicable to this case we think it should be so." [Page 700].

It follows that there is no independent evidence of the corpus delicti to render the confessions admissible. The judgment is reversed and the cause remanded to the District Court of Millard County with directions to grant a new trial.

HANSON and MOFFAT, JJ., concur.

WOLFE, Justice (dissenting).

I dissent. I can agree in what is said in the court's opinion up to the point where it is stated:

"The rule we deduce from the way it is applied in the overwhelming majority of the cases is that there must be evidence, idependent of the confession, corroborative thereof, consistent therewith, forming a basis or foundation for the confession, and tending to confirm and strengthen it, before the confession may be considered by the jury as evidence of guilt."

The corpus delicti must be proved independently of the confession. Some textbook writers and judges use the phrase that there must be corroboration of the confession by independent evidence of the corpus delicti. A moment's reflection will reveal that the two ideas are not quite the same. Where it is stated that there must be corroboration of the confession by other evidence showing the commission of a crime there is implied the conception that the confession is to be admitted, taken as a basis and then other evidence required to corroborate it. The procedure is not to look at the confession and then at the independent evidence of corpus delicti to see if it is corroborated, by the latter, but to put one's hand over the confession as *if it had never been introduced* and see if there is *independent* evidence of the two elements of the corpus delicti, to wit: (1) Death of a person, and (2) Death by criminal agency. In other words, the question of whether there is evidence of the corpus delicti is not approached from, or through the confession but independently of it. This is because, as says the opinion, unless there is proof that a crime has been committed there is no occasion to investigate the third question: Did the defendant commit it? And the principle that there must be evidence that the crime of which defendant is accused has in fact been committed remains the same regardless of whether or not there is a confession. It is not necessary to decide that a confession must be corroborated by independent evidence of corpus delicti. The principle is that there must be evidence of the damage or injury and evidence that it was criminally inflicted and that the fact that a person says he was the criminal agent is not sufficient without independent evidence that the damage or injury was caused by

a criminal act. But it is not certain, nor need it be now decided, that the independent evidence must be corroborative of the confession or "consistent therewith," or "tend to confirm and strengthen it." If, for instance, by the independent evidence it is certain that a man met his death by foul play and another confessed that he killed him, but in a different way than the body revealed, it probably would not prevent the confession from being admissible provided at least that there was other evidence corroborating the confession. The opinion confuses the principle laid down in many jurisdictions that confessions must be corroborated (see Admissions and Declarations, 1 R. C. L. 580, Sec. 129), with the statement wrongly made that they must be corroborated by the independent testimony of corpus delicti. There may be independent proof of corpus delicti not corroborative of the confession and still circumstantial or other evidence which would corroborate the confession to the extent that the confessor really killed deceased. Whether the independent evidence of the corpus delicti must be corrborative or consistent with the confession is not before us and need not be decided. In fact, to say that the confession must be corroborated by independent evidence of corpus delicti consistent therewith puts the cart before the horse and is seemingly inconsistent with other portions of the opinion. It makes the admission of the independent evidence of corpus delicti seemingly conditional on whether it corroborates and is consistent with the confession. But in most cases proof of the corpus delicti precedes introduction of the confession and is introduced without thought as to whether it will corroborate or be consistent with a confession later to be introduced.

But the opinion I think falls into graver error when it states that in this case there was no evidence independent of the confession to prove the corpus delicti. Much as one sympathizes with this unfortunate young woman who had to bear alone under dire circumstances all the pain and hardship for which another was equally responsible, it should not

divert our minds from the true rule of law. The opinion leaves out of consideration of the independent proof of corpus delicti one very distinctive piece of evidence, to wit; the evidence of Dr. Wright that Fern told him she wanted to be examined in order to disprove that she had had a baby. The following facts were introduced independently of any confession: That the dead baby was hers; that she had disposed of it in the privy; that it died of asphyxiation; that she attempted to "alibi" herself from any connection with her own baby. Certainly such attempt might have been consistent with a desire to hide its birth rather than its death, but since the law states that the independent evidence of corpus delicti need be only slight, this appears to be sufficient until she explains her motive for attempting to frame a defense against any accusation that the baby belonged to her. The effect of the opinion is to require the independent evidence of the criminal agency part of the corpus delicti to be derived from the body itself. There are cases where people may be put to death by means which cannot be detected from any examination of the body. It would be unfortunate if we should lay down a rule that evidence of corpus delicti would not only have to be independent of the confession, but such as must be derived from an examination of the body. There may be conduct of the accused tending to prove criminal agency independent of the confession and relating to the body, but in regard to which the most complete examination of the body or any of its parts would furnish no probative evidence. The proof of an attempt to establish an alibi or completely dissever oneself from any connection with the body, plus proof that one had to do with the dead body is such evidence. This case presents an excellent illustration. The fact that such attempt may have been consistent with another motive than to hide the death does not make it any the less evidence tending to prove that the person so attempting wanted to disestablish any connection with the death. Such person may show on the stand another motive and let the jury decide. In the instant case

Fern's attempt to have the doctor pronounce her a non-mother may have been for the purpose not of attempting to avoid being implicated in a death but in the preliminary act of a birth. But the court cannot import into the case its own idea of what the motive may have been. If the acts are consistent with the motive of hiding an illegal implication in the death of the baby, it is some proof tending to show she illegally caused its death although there may be within her bosom another explanation.

The third part of the opinion from which I must dissent is the importation, by the writer of the opinion of the results of his own medical researches. This is certainly something new in opinion writing. The excerpts from medical authorities came not from the record in the case or any testimony but from the opinion writer's own researches into medical volumes. The doctor had given as his opinion that the baby died of asphyxiation. I cannot see that this court has the duty or the right to import into the opinion the statements of medical men to show that the doctor's opinion had no basis. We cannot take judicial notice of the opinions expressed by physicians in medical work. Perhaps if the doctor had been cross-examined along those lines he would have sufficiently justified his opinion in accordance with the excerpts imported in the opinion or he might have shown that they were not altogether accurate or that they did not furnish all the tests of suffocation. It is true that in all probability the doctor did not make as thorough an examination of the body as he might have because he had already, from Fern's statement to him, fully concluded that the child was suffocated. But he did give his opinion that death came from asphyxiation. It was then incumbent on defendant to attack such conclusion by showing that the body did not show the symptoms or indicia of asphyxiation. This court cannot supply such evidence of lack of support for the opinion. It cannot argue the defendant's case against the doctor.

I cannot agree that the objection to the doctor's expressing his opinion should have been sustained. It is generally true that where an expert is giving his opinion on personal knowledge or observations rather than on a hypothetical question he should first state such facts. But this means that he must state such facts as he has observed. It does not mean that he must have made the particular kind of examination which counsel thinks he should have made or that he should be able to say that he found or did not find certain things which counsel or this court after its excursions into the medical books thinks he should have testified as to finding or not finding in the baby's body.

The cross-examiner may discredit this opinion by showing the examination inadequate or superficial or by demonstrating that the doctor failed to find or observe certain indicia of a cause of death but that all goes to the credibility and not the admissibility.

I rather think, too, that a fair intendment of the doctor's testimony that "there was some internal force which caused death" was that the internal force was lack of oxygen which would have its effect internally. He meant to testify that such lack of oxygen came from asphyxiation. Asphyxiation means the act of causing asphyxia—a suspended animation of living organisms due to a deficiency of oxygen and an excess of carbon dioxide. The doctor was careful not to testify as to the cause of this asphyxia whether external or internal. His opinion that it died of asphyxia is admissible without his having to give an opinion as to whether the asphyxia was caused by suffocation or strangulation.

I differ on a fourth point. I do not think it necessary to determine in this case that the independent evidence of corpus delicti must precede the confession. I admit that such order is preferable, but there is respectable authority to the effect that if the independent evidence appears in the record the fact that it did not precede the confession is not ground for reversal. *People* v. *Jones,* 123 Cal. 65, 55 P. 698; *People* v. *Saunders,* 13 Cal. App. 743, 110 P. 825; *People* v. *Morley,*

8 Cal. App. 372, 97 P. 84; *People* v. *Besold,* 154 Cal. 363, 97 P. 871. Says Wharton, Vol. 1, Sec. 356, 12th Ed. on Criminal Law:

"In theory the corpus delicti should be satisfactorily established before any proof of the criminal agency in bringing about the state of facts is presented to the jury, that is, before the jury can proceed to consider who committed the crime; but in practice the criminal agency of accused in the transaction—as in producing death of deceased—is frequently so involved that the testimony of both issues is accepted at the same time; that is to say, in some cases the evidence establishing the existence of a crime at the same time points out the guilty agent of that crime, while in others the evidence of the crime is visible, but the perpetrator is unknown."

Therefore, I except from the statement in the opinion which reads:

"The law says that *before* such inquiry should be made, before defendant be called upon to face such an issue, the corpus delicti *must first be shown.*" (Italics added.)

FOLLAND, Chief Justice (dissenting). I concur in the views expressed by Mr. Justice WOLFE in his dissenting opinion.