**STATE of Utah, Plaintiff and Respondent,**

v.

**William W. CASTONGUAY, Defendant and Appellant.**

**No. 18000.**

Supreme Court of Utah.

May 9, 1983.

---

1. *Franklin Financial v. Ponderosa Associates,* et al., Utah, 659 P.2d 1040 (1983).

Ronald R. Stanger, Provo, for defendant and appellant.

David L. Wilkinson, Salt Lake City, for plaintiff and respondent.

HOWE, Justice:

The defendant appeals his conviction of attempted first degree murder on the ground that the evidence adduced at trial was insufficient to prove a specific intent to kill a peace officer in order to avoid or prevent arrest.

The version of the relevant facts which most supports the finding and judgment entered in the court below discloses the following scenario:

Shortly after midnight on December 11, 1980 Trooper Mangelson of the Utah Highway Patrol and Deputy Carter of the Juab County Sheriff's Department were riding together in Mangelson's marked patrol car in Nephi, Utah. They stopped to investigate the defendant's activities near his truck and camper parked on the street. They asked him for identification and observed a .338 magnum rifle lying on the camper bed with bullets in the clip but nothing in the chamber. They questioned him and demanded to see his truck registration papers which he produced to their satisfaction. Defendant asked for permission to stay where he was parked as he had drunk a few beers and wanted to go to sleep. Mangelson and Carter had no objections. The defendant and the officers parted on friendly terms. A little while later the officers returned to a point approximately 1902 feet distant from the camper to observe the defendant while staying out of his view.

According to testimony of the two officers, defendant was standing on the driver's side of the camper, then walked to the rear, pulled out his gun, and in rapid succession fired three shots in the direction of the officers' car. The defendant then crawled back into the camper, reemerged and walked away from the officers toward some buildings, carrying his rifle. The officers followed him in their car. Carter then got out and continued his pursuit on foot. Ac-

cording to Mangelson the defendant reappeared between two buildings, raised the gun as if to aim at the officers, but did not shoot. Mangelson testified that while he was driving on alone over gravel, he heard the defendant fire another shot in his direction and some object hit his car. He lost sight of the defendant again and when he next caught a glimpse of him, the defendant was still packing the rifle. Mangelson stopped his car, got out, took cover behind some boxes, and from a distance of 236 feet yelled at the defendant to "Stop. Throw the rifle down and lay [sic] down on the grass." Mangelson testified that in response the defendant fired another shot at him, but admitted under cross-examination that he did not see that shot being fired. Mangelson then returned fire twice. At that point the defendant backed against the wall of a building, still holding his rifle. Carter arrived at the corner of that building, saw the defendant and told him to throw down his rifle and raise his hands. The defendant dropped his rifle, raised his hands in the air immediately and started walking towards Carter offering no resistance. Other officers summoned over the dispatch radio converged on the scene and the defendant was placed under arrest.

After trial to the court sitting without a jury, the court found "[t]hat at the time the defendant shot at Officer Mangelson, across Main Street—to the east of Main Street, he, then, was doing so for the purpose of avoiding or preventing an arrest by a peace officer acting under cover of legal charge [sic]. And I find the defendant guilty." It is this last "Main Street shot" that resulted in the defendant's conviction, and we must therefore determine whether the evidence was sufficient to find the defendant guilty of attempted first degree murder.

U.C.A., 1953, § 76–5–202 provides:

Murder in the first degree.—(1) Criminal homicide constitutes murder in the first degree if the actor *intentionally* or *knowingly* causes the death of another under any of the following circumstances:

    *     *     *     *     *     *

(e) The homicide was committed *for the purpose of avoiding or preventing an arrest* by a peace officer acting under color of legal authority or for the purpose of effecting an escape from lawful custody. [Emphasis added.]

U.C.A., 1953, § 76–4–101 defines attempt as follows:

1. For purposes of this part, a person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for the commission of the offense, *he engages in conduct constituting a substantial step* toward commission of the offense.

2. For purposes of this part, conduct does not constitute a substantial step unless it is *strongly corroborative* of the actor's intent to commit the offense. [Emphasis added.]

■ To sustain the information accusing the defendant of attempted first degree murder, the State had the burden to prove beyond a reasonable doubt (1) that the defendant, by firing the "Main Street shot," engaged in conduct constituting a substantial step toward causing the death of another; (2) that he engaged in that conduct for the purpose of avoiding or preventing an arrest by a peace officer acting under color of legal authority; and (3) that he had the culpable mind required to show intent or knowledge to kill in order to avoid or prevent arrest.

Two pivotal questions must be answered in the affirmative before the defendant can be found guilty of attempted first degree murder:

1. Did the defendant's conduct disclose conscious deliberate preparation to kill Mangelson, which was foiled only through some extraneous interference and not through a volitional act or omission on the part of the defendant?

2. Did the defendant manifest, either by voicing his conscious desire, or by divulging by inference that this was his chosen objective, the specific intent to kill Mangelson in order to prevent or avoid arrest?

It is the question of intent that must be proved before the conduct may be said to be culpable. In establishing the nexus between intent and act it must be borne in mind that an attempt transcends intent, yet fails to culminate in its planned accomplishment. "When we say that a man attempted to do a given wrong, we mean that he intended to do specifically it, and proceeded a certain way in the doing. The intent in the mind covers the thing in full; the act covers it only in part." *Thacker v. Commonwealth,* 134 Va. 767, 114 S.E. 504, 506 (1922). The conduct of the defendant in the instant case, though culpable, cannot be taken alone to find the defendant guilty absent the concomitant intent to achieve the conscious objective. "The law can presume the intention so far as realized in the act, but not an intention beyond what was so realized. The law does not presume, because an assault was made with a weapon likely to produce death, that it was an assault with the intent to murder. And where it takes a particular intent to constitute a crime, that particular intent must be proved either by direct or circumstantial evidence, which would warrant the inference of the intent with which the act was done." *Thacker,* supra, 114 S.E. at 505.

This Court has in the past acknowledged the fact that criminal intent is seldom proved by direct evidence but must be instead inferred from the circumstances of the given facts. Nonetheless, we have also cautioned that the act in itself does not raise the presumption that it was done with the specific intent required to prove the offense. All the circumstances, when taken together, must admit of no other reasonable hypothesis than that of guilt to warrant conviction. *State v. Lamm,* Utah, 606 P.2d 229 (1980), and cases cited therein. *State v. Manus,* 93 N.M. 95, 597 P.2d 280 (1979). See also *State v. Whittinghill,* 109 Utah 48, 163 P.2d 342 (1945), applying that rationale to an assault with intent to rape. In virtually all cases we have examined where an attempt conviction was upheld, the defendant had either voiced or threatened his intent or else conducted himself in such unambiguous ways as to not reasonably allow for any other mens rea. See Attempted Murder, Annot., 54 A.L.R.3d 612, et seq.

No such certainty is revealed by the record here. Both Mangelson and Carter, as well as the defendant, testified that their initial contact at the camper was friendly. Defendant testified that he harbored no ill will against either officer, and had never shot at a human being. He further testified that he did not hear anyone shout at him until Carter told him to drop his gun. Mangelson unmistakenly admitted under cross-examination that he did not see the defendant's gun, let alone see the defendant point the gun at him at the time the alleged "Main Street shot" was fired. Furthermore, although Mangelson saw defendant carry his rifle through a grassy area, he did not at any time see a muzzle blast. Carter did not witness the "Main Street shot." An expert witness testified that at 300 yards a .388 Magnum would create a muzzle blast of an 18 inch diameter visible to a man directly in line of fire; that a cone shaped muzzle blast would be visible if a gun were held at a 90 degree angle away from a target; Mangelson was 236 feet away from the defendant when the alleged "Main Street shot" was fired. Yet he did not see a muzzle blast.

The defendant was an expert marksman capable of hitting "dead on" at a distance of one hundred yards. Had he intended to kill Mangelson to avoid or prevent his arrest, he would most likely have hit his target or within inches thereof. No evidence of a bullet was found anywhere near the site from which Mangelson returned fire in spite of a thorough search. All these voids in the evidence make it highly questionable that the defendant attempted to kill Mangelson to avoid arrest. The defendant's mindless shooting may have been reckless and was reprehensible and should in no way be sanctioned, but the information charged him with an offense which the State failed to prove.

This case shares many elements with *People v. Henry,* 3 Ill.App.3d 235, 278 N.E.2d 547 (1971). The criminal episode in that

case occurred during the Chicago Civil Rights riots in 1968. Some officers testified that they saw the defendant Henry shoot in the direction of their car; others could not corroborate that testimony. The officer who claimed he had been shot at saw the gun flash, but conceded that he would have noticed a muzzle blast even had the gun been held at a right angle to the car or pointed straight up in the air. Henry, like the defendant in the instant case, was an expert shot and could have easily hit the police car had that been his intent. In reversing Henry's conviction of attempt murder, the appellate court stated, 278 N.E.2d at 549: "The essence of the crime of attempt murder is the specific intent to take life. [Citations omitted.] Although an intent to take life may often be inferred from the character of an assault, the use of a deadly weapon, or the circumstances surrounding the act, the State's evidence failed to establish that the shots were fired with an intent to kill."

Likewise in this case, there is neither direct nor circumstantial evidence that the defendant intended to kill Officer Mangelson. This distinguishes the present case from *State v. Maestas,* Utah, 652 P.2d 903 (1982) where consistent evidence from several eye witnesses pointed to a specific intent by the defendant to kill the pursuing officer. At least one of those eye witnesses saw a gun in the hands of the defendant who allegedly had just committed a bank robbery; saw him point the gun toward the pursuing officer; heard the gun go off and saw smoke coming from the gun. The officer fired upon heard the gunshot pass nearby him. No such evidence exists in the instant case. All that has been established here is that the defendant was heard firing the "Main Street shot" but no one saw him aim. In this respect, the instant case is similar to the facts in *State v. Burusco,* 61 Utah 488, 214 P. 302 (1923). There this Court reversed a conviction for assault with a deadly weapon with intent to do bodily harm. The complaining witness testified that the defendant pulled out his pistol and

the witness heard the crack of a shot but did not see the defendant shoot, or know whether he shot in the air or shot at the witness or at all.

We must therefore conclude that there was insufficient evidence to show that the defendant attempted to kill Officer Mangelson in order to prevent or avoid his arrest. The conviction and sentence are set aside.

STEWART, OAKS and DURHAM, JJ., concur.

HALL, Chief Justice (dissenting):

The decision of the majority to reverse the judgment of the trial court on the grounds of insufficiency of the evidence is premised upon its own narrow factual conclusion that Officer Mangelson "admitted under cross-examination that he did not see that [Main Street] shot being fired." However, a review of Mangelson's testimony does not *mandate* such a conclusion. In fact, his testimony *reasonably* supports the contrary conclusion as reached by the trial court.

The scope of this Court's review of the sufficiency of the evidence to convict is as was most recently expounded in *State v. Petree:*[1]

[W]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted. *State v. Kerekes,* Utah, 622 P.2d 1161, 1168 (1980); *State v. Lamm,* Utah, 606 P.2d 229, 231 (1980); *State v. Gorlick,* Utah, 605 P.2d 761, 762 (1979); *State v. Daniels,* Utah, 584 P.2d 880, 882–83 (1978); *State v. Romero,* Utah, 554 P.2d 216, 219 (1976).

Mangelson's testimony on direct examination was as follows:

1. Utah, 659 P.2d 443 (1983).

Q (BY MR. EYRE) Okay. After you arrived at that particular [Main Street] location, could you describe for the court what then occurred?

A I gave my location on the radio to the dispatcher, and I told the other officers on the radio where I was, and where he was. And I got out of my patrol car. I knelt down behind some boxes and stuff that was there, and I drew my service revolver. And just as he got to the railing right here, I hollered at him to stop—throw the rifle down and lay down on the lawn there off the sidewalk.

Q Can you recall your exact words that you yelled at him?

A Well, that is pretty close. I said, "Stop. Throw the rifle down and lay down on the grass."

Q And what was his response?

A *He fired another shot at me.*

Q *Did you observe him firing it?*

A *Yes, I did.*

Q *And what did you observe?*

A *I observed him put the rifle to his shoulder and a shot go off.* [Emphasis added.]

Q And what is the distance across that road from where he was to where you were located?

A That distance is 236 feet.

THE COURT: And he missed you?

THE WITNESS: Yes.

Q (BY MR. EYRE) Did you observe where that round hit?

A I did not observe where that round hit.

\* \* \* \* \* \*

Q (BY MR. EYRE) Could you show the court where, exactly, he was standing?

A He was standing right against this wall here.

\* \* \* \* \* \*

Q (BY MR. EYRE) After he had fired that round, what then occurred?

A I returned two rounds. I shot two rounds at him.

\* \* \* \* \* \*

Q (BY MR. EYRE) After you had fired those two rounds, what then occurred?

A At that point Mr. Castonguay just backed up against the wall like this—had his back right against the wall and he didn't move. He just stayed there.

I got back on the radio. I told the other officers where he was and that he was just backed up there against the wall.

Q Okay. And were those other officers in this area by that time?

A Yes, they were.

Q Describe what you observed from that point on?

A Okay. He was—he had his back right to the wall here, just a couple of feet back from the sidewalk. Deputy Carter and City Police Officer Epperson were coming up this side of the courthouse, and they were about to the front at this time. They had a walkie-talkie.

I told them he was backed up against the wall here. I remained where I was. And Deputy Carter came around the front here, told him to throw the rifle down, and at that time he did.

He dropped the rifle, and they took him into custody right there.

Q And you observed the arrest?

A Yes.

Q And you were still located on the other side of Main Street?

A Yes. When I started down across the street, he was down on the ground, and they had him handcuffed.

\* \* \* \* \* \*

Subsequently, on cross-examination, Mangelson testified:

Q And you didn't see the defendant's weapon that night, at that time, did you, *prior to any shots* being taken?

THE COURT: Now, do you understand what that question is?

You better read that back, Mrs. Worthen.

(Whereupon, the last question propounded to the witness was read back by the reporter.)

THE COURT: Could you understand that question?

THE WITNESS: Are you asking me if I saw him with the weapon before he shot?

Q (BY MR. STANGER) *At the time that he was at Chapman's store by the courthouse, right on this corner.*

A *Are you talking about across this way, or across this way?*

Q *Right about Chapman's store.*

A Well, the answer to that is no, I didn't see the weapon.

Q What did you see?

A *I saw Mr. Catsonguay [sic] coming up through the grassy area out here, and he was still packing the rifle.*

Q *Is that all you observed?*

A *Well—is that all I observed?*

Q *Yes.*

A I think so. [Emphasis added.]

The foregoing cross-examination did little to further enlighten the court or to clarify the testimony given on direct. Furthermore, only under a strained interpretation thereof can it be said that the cross-examination either detracts from or contradicts the earlier testimony. This is to be seen in that the question which evolved the response from Mangelson that "I didn't see the weapon" was obviously confusing, if not wholly misunderstood. The question inquired not whether Mangelson saw the defendant aim and fire the "Main Street shot," but whether defendant's weapon was seen "prior to *any shots* being taken." This prompted the court to interject itself into the colloquy. Then defense counsel compounded the question by apparently (the record is unclear) drawing Mangelson's attention to an unidentified exhibit, drawing or sketch. A further colloquy then ensued as to the time and place of the event to which defense counsel's question was directed.

Whatever might be said of the weight to be given to Mangelson's response that "I didn't see the weapon," his answer to the very next question propounded to him would appear to neutralize his preceding answer:

Q What did you see?

A I saw Mr. Catsonguay [sic] coming up through the grassy area out there, *and he was still packing his rifle.* [Emphasis added.]

In all fairness, and in all due respect to the witness, when asked the broad question, "Is that all you observed," and he responded in the affirmative, it is not to be said that his response amounted to a contradiction of his testimony on direct that he saw the defendant put the rifle to his shoulder and fire the "Main Street shot" at him.

I would affirm the judgment and sentence of the trial court.