STATE of Utah, Plaintiff and Appellee,

v.

Peggy B. JOHNSON, Defendant and Appellant.

No. 900088.

Supreme Court of Utah.

Nov. 1, 1991.

Rehearing Denied Jan. 7, 1992.

R. Paul Van Dam, Charlene Barlow, Salt Lake City, for the State.

Ronald J. Yengich, Salt Lake City, for Johnson.

ZIMMERMAN, Justice:

Defendant Peggy B. Johnson was charged with three separate counts of attempted first degree murder of her husband, Danny Johnson, and one count of distribution of a controlled substance for value. With respect to the attempted murder charges, count I charged an attempt to use heroin to cause her husband's death, and counts II and III charged attempts to use, respectively, amphetamines and oxalic acid to achieve the same end. Johnson was found guilty on all three counts and was also found guilty of distribution of a controlled substance for value. She was sentenced to three concurrent prison terms of five years to life. Johnson appeals from the three attempted murder convictions but does not appeal from the distribution conviction. We affirm the attempted first degree murder conviction on count I, based on the administration of heroin. We reverse the conviction on count III, based on the administration of oxalic acid, but find sufficient evidence to support a conviction of attempted second degree murder on that count. We reverse the conviction on count II, which is grounded on the administration of amphetamines.

On appeal, we view the record facts in a light most favorable to the jury's verdict, *see, e.g., State v. Verde*, 770 P.2d 116, 117 (Utah 1989); *State v. Booker*, 709 P.2d 342, 345 (Utah 1985), and we recite the facts accordingly.

Prior to her convictions, Peggy Johnson owned The Shack, a bar in Willard, Utah. She also worked as a bail bondswoman and a constable. In approximately 1982, Johnson met Cindy Orozco when she bailed Orozco out of the Box Elder County jail.

Johnson and Orozco had various other contacts, at least one of which involved Johnson's bailing Orozco out of jail a second time. Orozco apparently never fully paid Johnson for her bail bond services.

In December 1987, Johnson contacted Orozco to talk about how Orozco could recover a guitar and stereo that Orozco's husband Richard (nicknamed Penny), had given Johnson as collateral for a bail bond. Later in December, Johnson met with Cindy and Penny Orozco. At trial, Cindy Orozco testified that during this meeting Johnson indicated a desire to "get rid of her husband" because they were having problems. Johnson asked the Orozcos if they knew of a drug on which a person could overdose.

Johnson again met with Cindy and Penny Orozco in early January 1988. Johnson told Cindy that Danny had been beating her, that he had a girlfriend, and that she was under a lot of stress. Johnson further explained that she did not want to divorce her husband because he would get half of her inheritance. Cindy testified that Johnson had concluded that the easiest way to get rid of Danny was to "overdose him." To that end, Johnson wanted the Orozcos to provide her with heroin. Cindy Orozco told Johnson that it would cost $300 to purchase enough heroin to cause an overdose. The Orozcos and Johnson then went to procure the drug. After dropping Penny and Johnson off at a bar, Cindy Orozco attempted to buy the heroin, but was unable to do so at the time. The Orozcos eventually used the $300 to purchase cocaine for their own use.

During the following week, after Cindy Orozco admitted to Johnson that she had used the $300 to purchase drugs for herself and Penny, Johnson continued to seek Cindy's assistance in obtaining drugs to administer to Danny Johnson. Although Cindy was somewhat hesitant, she agreed to provide Johnson with drugs after Johnson brought her daughter to the Orozcos'

house and had her describe her father's abuse of her mother.

On or about January 21, 1988, Johnson gave Orozco an additional $450 to buy heroin. Orozco purchased the heroin and gave it to Johnson. Three days later, Orozco went to Johnson's house to borrow some money to purchase drugs for Penny. Johnson told Orozco that she could not lend her any money because Danny would get upset. During this conversation, Orozco testified that Johnson then told her that the "stuff [indicating the heroin] didn't work."

On January 27, 1988, Orozco met with Officer Marci Vaughn of the Ogden Police Department and offered to help "make a drug bust" in return for leniency on a theft charge. Officer Vaughn confronted Orozco with information she had learned from Orozco's parole officer concerning statements Orozco had made about Johnson's apparent attempt to kill her husband. Orozco then agreed to cooperate with Officer Steve Vojtecky of the Utah Division of Investigations in his investigation of the allegations against Johnson.

On January 28, 1988, at Officer Vojtecky's direction, Orozco telephoned Johnson at The Shack. Officers recorded the conversation. Johnson told Orozco that she had a "new idea" but she could not talk about it in her husband's presence. Later the same day, Orozco called Johnson at her home, but Johnson refused to talk about the "new idea" over the phone.

The next day, Orozco went to Johnson's house wearing a body microphone. Officer Vojtecky recorded the conversation from outside the house. During this conversation, Johnson asked if Orozco knew where to get some "crank"—a street name for methamphetamine. Johnson explained that she had seen a television program that indicated that a person could be killed by taking too much crank. Johnson then told Orozco that she had administered various other substances to her husband, all of which had failed to kill him.[1]

1. The transcript of the recorded conversation, which was introduced at trial, provides in part:

 Johnson: (inaudible) I can't believe all this shit hasn't done anything.

 Orozco: Well, what all ... what all have you like tried and stuff?

 Johnson: That that I got from you.

 Orozco: Yeah.

After Orozco left the house, Vojtecky requested that she go back and ask Johnson for money to buy the crank and to explain how she intended to administer the drug. In response to Orozco's inquiry, Johnson replied that she planned to put it in capsules. In a telephone conversation the same day, Johnson agreed to meet Orozco at Orozco's house and to bring money for the crank. On January 30, 1988, Johnson arrived at the house and spoke with Orozco, who was once again wearing a body microphone, and Vojtecky, who was acting as Orozco's boyfriend. During this conversation, Johnson asked how she should administer the crank and inquired whether she could put it in her husband's coffee. Johnson explained that she planned to administer it to him in this manner one night when he came home. Vojtecky informed her that the crank would kill him and asked if that's what she wanted. Johnson replied, "This sounds horrible, but yes." Johnson then gave Vojtecky $500 to purchase the crank.

Also during this conversation, Johnson discussed her prior attempts to poison her husband. She told Vojtecky that she had already used most of a bottle of oxalic acid in her husband's capsules over the previous month and that he was still taking capsules containing oxalic acid everyday. She stated that she gave her husband an entire box of Decon in capsules which he had taken over a one-month period. She further explained how she had put the heroin in a capsule on January 21 and given it to her husband personally. She explained that none of these attempts had worked.

Johnson: And amoc ... Amoxlic ... acid ...
Orozco: Amoxlic acid?
Johnson: Uh-huh. A whole bottle of it.
Orozco: A whole bottle of it?
Johnson: You know, he's been taking the capsules ... about that much every day. Tried a whole thing for thirty days and uh-huh. Decon. Didn't work. And this stuff. Looked it up here in the encyclopedia.
Orozco: How do you pronounce it?
Johnson: Oxalic. Oxalic.
Orozco: Hmmm. He's ??? Tricky.
Johnson: Yeah.
Orozco: I know. I can see that. And it's ... it's crystal?

Later that evening, Vojtecky and Orozco met Johnson in Willard, Utah, and gave her some counterfeit crank made of brown sugar and flour. Vojtecky testified that Johnson appeared to put the counterfeit crank under her dashboard. When other officers stopped Johnson's car a short time later, however, they were unable to find any of the substance.

At trial, the State produced evidence that supported this version of the facts. Specifically, subsequent tests performed on the capsules that Danny ingested showed that they contained the same substance as the bottle in the Johnson home labeled "oxalic acid." Danny Johnson testified at trial that he had been taking the capsules for a month and that he had noticed stomach cramps, weakness, and a burning sensation in his throat on at least one occasion after taking a pill. Danny also testified that his wife had given him a capsule before he went to bed on the night of January 21, the same night, according to his wife's statement to the undercover officer, that she had put heroin in his capsules. He testified that he awoke at approximately 6 a.m. with stomach discomfort and dizziness. He also testified that he broke out in a cold sweat and that he vomited the morning after taking the capsules.

The jury returned a verdict of guilty on all three counts of attempted first degree murder. Each count alleged that Johnson attempted to cause the death of her husband through the administration of poison or a lethal substance or a substance in a lethal amount for the purpose of pecuniary or other personal gain. The jury also convicted Johnson on a fourth count, distribu-

Johnson: Yeah.
Orozco: What do they usually use it for?
Johnson: Taking the paint off (inaudible).
Orozco: Takin' the what?
Johnson: Paint off metal.
Orozco: Off metal?
Johnson: Yeah.
Orozco: Hmmm. So crank, huh? Well, I don't know. I guess I could probably get back with ya. I might ... I maybe can, you know, know someone.
Johnson: I don't think coke will do it. I don't think he'd do enough of that. And if you could get heroin liquid and everything, how much would that take?

tion of a controlled substance for value. After trial, Johnson retained new counsel, who immediately filed a motion for a new trial. The court denied the motion, and this appeal followed.

Johnson challenges her conviction on all three counts of attempted first degree murder, relying on two grounds. First, she contends that the evidence is insufficient to support a verdict of guilty. Second, she claims that statements she made to the Orozcos and the undercover investigators concerning the alleged crimes were admitted improperly because the State had failed first to show independent evidence of a corpus delicti. *See State v. Weldon*, 6 Utah 2d 372, 314 P.2d 353 (1957).

 We first consider the insufficiency of the evidence claims as to each count. The appropriate standard of review is as follows:

> In considering a claim of insufficiency of the evidence, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury. We reverse a jury conviction for insufficient evidence only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted."

*State v. Verde*, 770 P.2d 116, 124 (Utah 1989) (quoting *State v. Booker*, 709 P.2d 342, 345 (Utah 1985)). We note that the trial court considered defendant's insufficiency of the evidence claim in denying the motion for a new trial. This action lends further weight to the jury's verdict. *See generally State v. Williams*, 712 P.2d 220,

222 (Utah 1985) (acknowledging that trial court has discretion in granting or denying motions for new trials in criminal cases); *State v. Weaver*, 78 Utah 555, 561, 6 P.2d 167, 169 (1931); *State v. Mellor*, 73 Utah 104, 116, 272 P. 635, 639 (1928).

 Moving to the merits of the sufficiency challenges, the elements of the crime charged are drawn from two statutes, the attempt statute and the first degree murder statute. To be guilty of an attempt, the actor must engage "in conduct constituting a substantial step toward commission of the offense" with the mental state "otherwise required for the commission of the offense." Utah Code Ann. § 76-4-101(1) (1990).[2] To be guilty of first degree (or capital) murder, the actor must commit what would otherwise be a second degree murder, i.e., "intentionally or knowingly" cause the death of another, and in addition, must do so under circumstances where at least one of several aggravating factors listed in the statute is shown to be present. Utah Code Ann. § 76-5-202 (1990). Here, the State relied on two of the listed aggravating factors: first, the commission of a homicide "by means of the administration of a poison or of any lethal substance or of any substance administered in a lethal amount, dosage, or quantity," Utah Code Ann. § 76-5-202(1)(n) (1990), and second, the commission of a homicide "for pecuniary or other personal gain." Utah Code Ann. § 76-5-202(1)(f) (1990).

 To summarize, in order to convict Peggy Johnson of attempted first degree murder, the State had the burden of proving beyond a reasonable doubt the following: (i) she had the intent to kill or knowledge that her acts would result in death if

---

**2.** The attempt statute provides:

> (1) For purposes of this part a person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for the commission of the offense, he [or she] engages in conduct constituting a substantial step toward commission of the offense.
>
> (2) For purposes of this part, conduct does not constitute a substantial step unless it is strongly corroborative of the actor's intent to commit the offense.

> (3) No defense to the offense of attempt shall arise:
> (a) Because the offense attempted was actually committed; or
> (b) Due to factual or legal impossibility if the offense could have been committed had the attendant circumstances been as the actor believed them to be.

Utah Code Ann. § 76-4-101 (1990).

carried out; (ii) she engaged in conduct constituting a substantial step toward causing the death of her husband; and (iii) she did so either (a) by administering or attempting to administer a "poison ... or lethal substance or ... [a] substance administered in a lethal amount, dosage, or quantity" or (b) "for pecuniary or other personal gain." Utah Code Ann. § 76–4–101(1) (1990); Utah Code Ann. § 76–5–202(1)(n); Utah Code Ann. § 76–5–202(1)(f); *see State v. Castonguay*, 663 P.2d 1323, 1325 (Utah 1983). We will consider Johnson's sufficiency of the evidence challenge to her convictions on each of the three counts separately.

■ We first address count II. That count alleges that Johnson attempted to cause her husband's death by administering methamphetamines. We assume, without deciding, that evidence of the requisite intent to kill is present. However, we conclude that there is insufficient evidence for a jury to find beyond a reasonable doubt that Johnson's actions amounted to a "substantial step" toward commission of first degree murder by administration of methamphetamine.

■ The State argues that Johnson's giving $500 to Vojtecky to purchase the counterfeit crank constitutes a "substantial step" toward commission of the crime. We disagree. In order for conduct to constitute a substantial step, there must be more than mere preparation. *See State v. Castonguay*, 663 P.2d at 1326; *State v. Otto*, 102 Idaho 250, 629 P.2d 646, 647 (1981). All that is shown from the record is that Johnson purchased counterfeit crank from undercover officers. There is no showing that she attempted to administer the substance. Indeed, there is no evidence as to what she did or attempted to do with it.

She may have used it herself or simply disposed of it. When the police pulled her car over after she purchased the "crank," officers did not find any counterfeit crank in her car or on her person. The mere purchase of the counterfeit crank from an undercover officer does not go beyond preparation and therefore is not the substantial step needed to support a conviction for attempted first degree murder. *See Otto*, 629 P.2d at 650 (solicitation of a professional killer not substantial step).[3]

Because there is insufficient evidence to support a finding of a substantial step on count II, there is no need for us to consider the evidence regarding either of the charged aggravating circumstances that would elevate the attempted second degree murder charge to first degree. We reverse Johnson's conviction under count II.

■ Johnson also challenges her conviction under count III, which alleges that she attempted to kill her husband by administering oxalic acid. As with count II, the State must have proven the requisite mental state, the requisite conduct, and the requisite aggravating circumstance. As to the first element, there is sufficient evidence to show that Johnson had the requisite state of mind. Johnson indicated to Orozco that she had given her husband an entire bottle of oxalic acid in small doses in his ampicillin capsules. Johnson made this statement during a conversation with Orozco in which they were discussing how large a dose of heroin would be fatal.[4] The jury could certainly infer from these statements, and others that Johnson had made about failed attempts to poison her husband, that Johnson administered the oxalic acid with the necessary intent or knowledge.

---

**3.** The fact that the counterfeit crank was harmless does not figure in our determination that its purchase failed to establish a substantial step toward the commission of the crime. Indeed, as the State points out, impossibility is no defense to an attempt in Utah. Section 76–4–101(3)(b) provides:

 (3) No defense to the offense of attempt shall arise:

 . . . .

 (b) Due to factual or legal impossibility if the offense could have been committed had the attendant circumstances been as the actor believed them to be.

Utah Code Ann. § 76–4–101(3)(b) (1990).

**4.** As discussed later in this opinion, we conclude that there is sufficient evidence apart from these statements to satisfy the corpus delicti rule, and therefore, the statements were admitted properly.

As for the second element of the attempt charge, the question is whether the evidence was sufficient to support the jury's finding that Johnson's conduct constituted a substantial step toward the commission of murder. There is no question that there was evidence sufficient to show that Johnson actually administered the oxalic acid to her husband. Johnson's statements about giving her husband an entire bottle of the substance in his ampicillin capsules was corroborated by the officers' discovery of oxalic acid under the sink at her home and tests run on the ampicillin capsules that showed them to contain oxalic acid. That fact is sufficient to support a finding of the conduct element of an attempted intentional killing.[5]

■ The final issue to be addressed is the sufficiency of the evidence of the aggravating circumstances necessary to raise the murder attempted from second degree to first degree. The aggravating circumstances charged were (i) attempting to kill by administration of oxalic acid, which was either (a) a "poison" or "a lethal substance" or (b) "a substance administered in a lethal amount, dosage or quantity"; or (ii) attempting to kill "for the purpose of pecuniary or other personal gain." Utah Code Ann. § 76–5–202(1)(n); Utah Code Ann. § 76–5–202(1)(f) (1990). We will deal first with the two-part issue presented by the oxalic acid. We then will address the personal gain issue.

Respecting the oxalic acid, the State did not prove the first of the so-called poison alternatives, i.e., it did not demonstrate that oxalic acid is a poison or a lethal substance. There was evidence that oxalic acid in some unspecified amount may kill, but there was also evidence that oxalic acid is produced naturally by the body in small amounts. This state of the evidence is insufficient to support a finding beyond a reasonable doubt that oxalic acid is a poison or a lethal substance.

The State's second poison alternative was to prove that the oxalic acid was administered or attempted to be administered in a "lethal amount, dosage, or quantity." Utah Code Ann. § 76–5–202(1)(n). The problem with the State's case is that there was no showing at trial as to the quantity of oxalic acid that would constitute a lethal dose, much less that Johnson attempted to administer such an amount.

■ The State responds that under the attempt statute, failure to demonstrate the lethality of the dosage of oxalic acid administered or attempted to be administered cannot bar a conviction for an attempted first degree murder. The State relies on section 76–4–101(3)(b), which provides that no defense to a prosecution for attempt arises "[d]ue to factual or legal impossibility if the offense could have been committed had the attendant circumstances been as the actor believed them to be." Utah Code Ann. § 76–4–101(3)(b) (1990). We agree that under this statute factual impossibility generally is no defense to an attempt charge. However, where the charge is attempted first degree murder, which is distinguishable under section 76–5–202(1) from attempted second degree murder only by the presence of specified objective aggravating circumstances, the legislature must have intended that the aggravating circumstance actually be present. Therefore, a subjective mistake by the actor as to the presence of an aggravating circumstance required by section 76–5–202(1) would be a defense to a charge of attempted first degree murder. Under such circumstances, the actor can be convicted only of an attempted intentional killing—attempted second degree murder.

Based on the foregoing, we conclude that because the State failed to prove either that oxalic acid is a poison or a lethal substance or that Johnson administered or attempted to administer a quantity of the acid that would have been lethal, a conviction for attempted first degree murder

---

5. The fact that impossibility is not a defense under section 76–4–101(3) permits us to find the evidence of a substantial step sufficient without requiring us to probe into whether oxalic acid, in the amounts intended to be administered, would have proven fatal. Utah Code Ann. § 76–4–101(3) (1990).

could not be supported on the basis of proof of the aggravating circumstances described in section 76–5–202(1)(n).

This leaves us with the second aggravating circumstance charged, attempting to kill "for the purpose of pecuniary or other personal gain." Utah Code Ann. § 76–5–202(1)(f). However, before we consider the sufficiency of the evidence on that issue, we are confronted with a problem. The jury returned a verdict of guilty on the attempted first degree murder charge without specifying the aggravating circumstance upon which the verdict was based, even though it was submitted to the jury on both charged aggravating circumstances. There is evidence of a motive of pecuniary gain on Johnson's part. Specifically, there was testimony that Johnson had wanted to divorce her husband for two years prior to her arrest but was afraid to do so because she thought that if she did, he would get half of the inheritance she received from her father. A motive to deprive another of what the law might award him or her in the event of a divorce seems sufficient to make out a case for application of section 76–5–202(1)(f). One might argue that we should affirm the attempted first degree murder verdict if there is sufficient evidence to support a finding of guilt under either of the aggravating circumstances therein presented. *See State v. Tillman,* 750 P.2d 546, 565–68 (Utah 1987) (Hall, C.J., plurality opinion). We conclude, however, that such an avenue is not open to us here.

In a civil case, we will affirm a general verdict so long as there is one legally valid theory among those upon which the case went to the jury and sufficient evidence to support a verdict on that theory. *See Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1241–42 (Utah 1987). However, in a criminal case the rule is to the contrary. A majority of this court has stated that a jury must be unanimous on all elements of a criminal charge for the conviction to stand. *See Tillman,* 750 P.2d at 585–88 (Durham, J., concurring & dissenting); *id.* at 591 (Zimmerman, J., concurring & dissenting); *id.* at 577–80 (Stewart, J.,

concurring in the result). From this premise, it follows that a general verdict of guilty cannot stand if the State's case was premised on more than one factual or legal theory of the elements of the crime and any one of those theories is flawed or lacks the requisite evidentiary foundation. In such circumstances, it is impossible to determine whether the jury agreed unanimously on all of the elements of a valid and evidentially supported theory of the elements of the crime.

In the present case, the jury returned a general verdict of guilty on each count of attempted first degree murder. No special verdicts were given that would indicate upon which aggravating circumstance the jury based the conviction. Because we cannot determine whether the jury was unanimous on the elements of the offense based on section 76–5–202(1)(f) alone, the insufficiency of the evidence to support the State's proof of the section 76–5–202(1)(n) aggravating circumstance makes it impossible for us to affirm on the alternative pecuniary gain theory. Therefore, we must reverse the attempted first degree murder conviction on count III.

That does not end the matter, however. Section 76–1–402(5) of the Code allows an appellate court to enter a conviction for a lesser included offense under certain circumstances. That section provides that if

there is insufficient evidence to support a conviction for the offense charged but . . . there is sufficient evidence to support a conviction for an included offense and the trier of fact necessarily found every fact required for conviction of that included offense, the verdict . . . may be . . . reversed and a judgment of conviction entered for the included offense, without necessity of new trial, if such relief is sought by the defendant.

Utah Code Ann. § 76–1–402(5) (1990). Although technically Johnson did not seek to reduce the sentence from attempted first degree murder to the lesser included offense on appeal, we deem the requirements of the statute satisfied because she requested that the jury be given a lesser

included instruction and she attacks the conviction for attempted first degree murder on appeal. She therefore can claim no surprise at this court's consideration of a lesser included offense.

In the present case, the only basis we rely upon for overturning the attempted first degree murder conviction is a lack of evidence on the aggravating circumstances charged. However, the other elements of the attempted first degree murder charge under count III, for which we found ample evidence to support the verdict of guilt, are identical to the elements of the lesser included charge of attempted second degree murder. *Compare* Utah Code Ann. § 76–5–202 (1990) *with* Utah Code Ann. § 76–5–203(1)(a) (1990) (amended 1991). The fact that the evidence was insufficient to sustain that verdict as to the aggravating circumstance in no way undermines the finding of the elements necessary for attempted second degree murder. We therefore direct the trial court to enter a judgment of conviction for that offense on count III.[6] *See* Utah Code Ann. § 76–1–402(5) (1990); *State v. Bolsinger,* 699 P.2d 1214, 1221 (Utah 1985) (plurality opinion); *State v. Bindrup,* 655 P.2d 674, 676 (Utah 1982).

■ We now consider Johnson's challenges to her conviction under count I, which charged her with attempting to cause the death of her husband by the administration of heroin. Here, again, the State was required to prove the same elements: (i) intent or knowledge; (ii) conduct constituting a substantial step toward the killing; and (iii) an aggravating circumstance, either (a) that the attempt was by the administration of a poison or a substance in a lethal amount or (b) that the attempt was for the purpose of pecuniary or other personal gain. We find the evidence sufficient to support the jury's verdict.

There is ample evidence to support the jury's verdict that Johnson intended to kill her husband or had knowledge that her actions, if successful, would result in death to satisfy the mental element. For example, the evidence showed that Johnson asked Orozco if she knew of a drug that could "overdose someone." After finding such a drug, Johnson wanted to obtain a sufficient amount to achieve the desired result. To that end, she gave Orozco money on two separate occasions to purchase the required heroin. From these facts, the jury could reasonably find that Johnson had the requisite mental state.

There was also evidence that Johnson engaged in conduct constituting a substantial step toward commission of the crime. In addition to supplying the money to purchase the drug, Johnson told Vojtecky that she had chopped up the heroin and given it to her husband in his capsules. There was confirmatory testimony by her husband that he actually had taken the heroin-filled capsules. Johnson later admitted to Orozco that even after giving her husband the heroin, "the stuff didn't work."

As for proof of the necessary aggravating circumstance, defense counsel conceded during oral argument that the administration of the heroin was sufficient to bring the case within the "poison" or "lethal amount, dosage, or quantity" language of section 76–5–202(1)(n). Additionally, the evidence supporting the aggravating circumstance of pecuniary or other personal gain is sufficient for the same reasons stated with regard to count III. Therefore, there was ample evidence to support the finding of guilty on count I.

As a second line of attack, Johnson argues that the State failed to make a prima facie showing of the corpus delicti necessary to admit her incriminating statements.

---

6. This case is distinguishable from *State v. Bolsinger,* 699 P.2d 1214 (Utah 1985), where the court vacated a conviction for second degree murder and entered a conviction for manslaughter, an offense that requires a wholly different mental state. In his separate concurring and dissenting opinion in that case, Justice Stewart expressed concern that section 76–1–402(5) would be misapplied if used to enter a conviction for a lesser included offense that required a different mens rea than the charged crime. *See Bolsinger,* 699 P.2d at 1221 (Stewart, J., concurring & dissenting). No such situation is present here. The mens rea required for the lesser included offense of attempted second degree murder is either identical to or included within that required for attempted first degree murder.

Absent the admission of her statements prior to her arrest, she claims, there was insufficient evidence to support a conviction for first degree murder.

■ We first consider the timeliness of the raising of this issue. Trial counsel failed to preserve this by objecting to the admission of the statements in a timely manner. Current counsel first raised the claim in a motion for a new trial. At that time, the State argued that counsel's failure to raise the issue earlier waived the claim. *See* Utah R.Evid. 103(a)(1). However, in disposing of the new trial motion, the trial judge did not rely on waiver, but addressed the merits of the issue. *See* Utah Code Ann. § 77–35–24 (1982) (repealed 1989) (current version at Utah R.Crim.P. 24). In its order denying the motion, the court found that Johnson's statements did not fall within the purview of the corpus delicti rule because the statements were part of the crime, not confessions:

> The *State v. Weldon* case cited by Defendant (314 P.2d 353) does not extend the Corpus Delecti [sic] Rule as it relates to confessions made by the Defendant to all statements made by the Defendant. In this case, the now objected to statements were made in connection with the activity itself, not after arrest and were not introduced in the form of a confession but to show a motive and intent at the time other actions were taking place. It is the judgment of this Court that such statements are admissible as part of the case in chief and may be used to show Corpus Delecti [sic].

Because the trial court addressed the corpus delicti issue fully and did not rely on waiver, we consider the issue on appeal, even though trial counsel failed to properly preserve it as required by Utah Rule of Evidence 103(a)(1). *See State v. Matsamas,* 808 P.2d 1048, 1053 (Utah 1991). *But see State v. Belgard,* 811 P.2d 211, 217 n. 2 (Utah Ct.App.1991), *cert. granted.* One of the primary reasons for imposing waiver rules like rule 103(a)(1) is to assure that the trial court has the first opportunity to address a claim that it erred. If the trial court already has had that opportunity, the justification for rigid waiver requirements is weakened considerably.

Some might argue that our refusal to find waiver under these circumstances will give defense counsel a tactical advantage because they can withhold an objection at trial and, in the event of an adverse result, still challenge the admissibility of the evidence in a motion for a new trial, thus preserving the opportunity to appeal. A clear understanding of such a tactic points out its perilousness. For example, the trial court may refuse to consider the merits of the argument on the motion for new trial because it may find the issue waived. If so, the issue can be considered on appeal only if the appellate court concludes that the admission of the evidence was plain error. *State v. Verde,* 770 P.2d 116, 121 (Utah 1989); *State v. Bullock,* 791 P.2d 155, 158 (Utah 1989), *cert. denied,* — U.S. —, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990).

Turning to the merits, the State makes two arguments. First, it contends, as the trial court apparently found, that the corpus delicti rule does not apply to Johnson's statements because they were made during the commission of a crime. The State would limit the doctrine's application to postcrime or postarrest statements or to statements made when a defendant knows he or she is the focus of an investigation. Alternatively, the State argues that even if the corpus delicti rule applies here, it is satisfied if the court adopts a "trustworthiness" standard as to evidence of corpus delicti. We will address both of these arguments.

■ Initially, we note that the trial court's ruling that the corpus delicti rule does not bar admission of the statements is a question of law, and accordingly, our standard of review is correctness. *E.g., Rollins v. Petersen,* 813 P.2d 1156, 1159 (Utah 1991); *Landes v. Capital City Bank,* 795 P.2d 1127, 1129 (Utah 1990). We also note that because we have reversed the entire conviction on count II, we consider the corpus delicti question only with respect to counts I and III.

**1162** 

 Our analysis begins with a definition of the corpus delicti rule and an overview of its scope and operation. The corpus delicti rule states that before a defendant's inculpatory statements can be introduced as evidence against the defendant, the State must prove the occurrence of a crime, i.e., a corpus delicti. *State v. Johnson*, 95 Utah 572, 579–80, 83 P.2d 1010, 1014 (1938), *overruled on other grounds, State v. Crank*, 105 Utah 332, 355, 142 P.2d 178, 188 (1943). Although the rule traditionally concerns after-the-fact confessions, the policy underlying the rule's application is equally applicable to admissions because they are subject to the same possibilities for error.[7] *See Opper v. United States*, 348 U.S. 84, 90–91, 75 S.Ct. 158, 162–164, 99 L.Ed. 101 (1954). The rule is designed as a "safeguard against convicting the innocent on the strength of false confessions." *State v. Weldon*, 6 Utah 2d 372, 373, 314 P.2d 353, 354 (1957); *see also City of Bremerton v. Corbett*, 106 Wash.2d 569, 576, 723 P.2d 1135, 1139 (1986).

Corpus delicti must be established through evidence, independent of the confession or admission, that "the injury specified ... occurred, and that such injury was caused by someone's criminal conduct."[8] *State v. Knoefler*, 563 P.2d 175, 176 (Utah 1977); *see also State v. Calamity*, 735 P.2d 39, 41 (Utah 1987); *Johnson*, 95 Utah at 580–81, 83 P.2d at 1014–15. Our past cases have consistently required that the independent evidence show two things: (i) "[t]hat a wrong, an injury, or a damage has been done," and (ii) "that such was effected by a criminal agency, i.e., without right or by unlawful means." *Johnson*, 95 Utah at 580, 83 P.2d at 1014. Under our prior

cases, the State is not required to show independent evidence "that the accused was the guilty agent." *See, e.g., Calamity*, 735 P.2d at 41; *Knoefler*, 563 P.2d at 176; *Weldon*, 6 Utah 2d at 376–77, 314 P.2d at 356 (1957); *State v. Ferry*, 2 Utah 2d 371, 372, 275 P.2d 173, 173 (1954); *Johnson*, 95 Utah at 580, 83 P.2d at 1014.

 We first address the State's argument that the corpus delicti rule does not extend to Johnson's statements because they were not "confessions" in the normal sense of the term since they occurred during the commission of the crimes charged. A number of federal and state courts addressing this issue have concluded that the corpus delicti rule is inapplicable to statements made prior to or during the commission of a crime. In *Warszower v. United States*, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876 (1941), the Supreme Court concluded that statements made prior to the commission of a crime did not "contain [any] of the inherent weaknesses of confessions or admissions after the fact" and, therefore, the corpus delicti doctrine's requirement of corroboration was not necessary. *Id.* at 347, 61 S.Ct. at 606. This position was confirmed in *Opper v. United States*, 348 U.S. at 90, 91, 75 S.Ct. at 162, 163. *See also Castillo v. State*, 614 P.2d 756, 759 (Alaska 1980); *State v. Saltzman*, 241 Iowa 1373, 1382, 44 N.W.2d 24, 28–29 (1950); *State v. Libby*, 546 A.2d 444, 451 n. 6 (Me.1988); *People v. Hamp,* 110 Mich.App. 92, 97, 312 N.W.2d 175, 178 (1981). Because this appears to be the majority position and is supported by sound policy, we follow this approach in this case. Whatever the rule as to the need for caution in admitting inculpatory statements made after the

---

7. A confession, as is it is generally understood, is an "express acknowledgment by a defendant of his [or her] guilt of the crime with which he [or she] is charged." 29 Am.Jur.2d *Evidence* § 523 (1967). An admission, on the other hand, is an acknowledgment of some fact or circumstance from which guilt may be inferred. Although confessions are also admissions, they are special types of admissions because they contain admissions of the criminal act itself and not mere admissions upon which guilt may be inferred. *Id.; see State v. Karumai*, 101 Utah 592, 601, 126 P.2d 1047, 1052 (1942) (recogniz-

ing the distinction between confessions and admissions).

8. We note that some confusion has arisen surrounding *corpus delicti because the term has* more than one use. This case involves the question of when proof of the crime is required to allow introduction of a defendant's confession. In another context, *corpus delicti refers to evidence that the crime was committed. See State v. Rebeterano*, 681 P.2d 1265, 1267–68 (Utah 1984).

crime, there seems to be little need for extraordinary protective measures for statements made before or during the crime's commission.

■ Before we begin our corpus delicti analysis of the evidence on counts I and III, we must first address the quantum of proof necessary to satisfy the corpus delicti rule and serve as a predicate for the admission of postcrime inculpatory statements. This should help us to determine the harmfulness of any trial court error in the admission of postcrime inculpatory statements before the independent evidentiary foundation was laid.

The precise quantum of independent evidence necessary to satisfy the Utah corpus delicti rule is somewhat unclear because of inconsistent statements of the standard in our prior cases. *See Weldon,* 6 Utah 2d at 376, 314 P.2d at 357; *Ferry,* 2 Utah 2d at 372, 275 P.2d at 173 n. 2; *Johnson,* 95 Utah at 579, 83 P.2d at 1016; *State v. Wells,* 35 Utah 400, 409, 100 P. 681, 684–85 (1909), *overruled on other grounds, Crank,* 105 Utah at 352, 142 P.2d at 187. Our initial statements of the standard required that the independent evidence prove the corpus delicti beyond a reasonable doubt. *Wells,* 35 Utah at 409, 100 P. at 684. Over time, this standard has been softened, but it is difficult to determine precisely how much.

In *Johnson,* 95 Utah at 581, 83 P.2d at 1016, we held that the independent corroborative evidence of the corpus delicti need only be consistent with and tend to "confirm and strengthen the confession." *Id.* at 583, 83 P.2d at 1016. Although this weakened the standard of *Wells,* it did not fix the new standard with any degree of certainty. We attempted to clarify the matter in *Ferry,* 2 Utah 2d at 372, 275 P.2d at 173, when we held that evidence of the corpus delicti must be proven by clear and convincing evidence. However, this apparently clear standard was questioned only three years later in *Weldon,* 6 Utah 2d at 377, 314 P.2d at 356. In *Weldon,* the ma-

jority of the court observed in dictum that the clear and convincing standard of *Ferry* was a more stringent burden than was required by the purposes underlying the rule and that it might produce results unduly favorable to defendants. *Id.* However, notwithstanding this criticism of the *Ferry* standard, the *Weldon* majority recognized that *Ferry* stated the applicable standard and required a finding of clear and convincing evidence of corpus delicti. *Id.* at 377, 314 P.2d at 357. It then analyzed the evidence under that standard and found that the standard was not met.

The State argues that the dicta in *Weldon* and the lack of reference to *Ferry* and its standard in other post-*Ferry* cases suggest that we have abandoned the clear and convincing standard and moved towards a softer "trustworthiness" standard. *See, e.g., State v. Petree,* 659 P.2d 443, 444 (Utah 1983); *State v. Cazier,* 521 P.2d 554, 555 (Utah 1974); *Weldon,* 6 Utah 2d at 377, 314 P.2d at 354. As noted above, however, only dicta in *Weldon* supports the State's argument. Other cases relied upon by the State do little to bolster its position. For example, although language in *Cazier* arguably phrases the standard in softer terms than *Ferry,* it is clear from the opinion that the evidence was sufficient to meet the clear and convincing standard of *Ferry.* Finally, any reliance on *Petree* is misplaced because it deals with the proof of "corpus delicti" in the context of an examination into the sufficiency of circumstantial evidence to support a guilty verdict on a murder charge and not the independent evidence needed to satisfy the corpus delicti rule on the admission of postcrime inculpatory statements. *See Petree,* 659 P.2d at 447.

In summary, our review of the post-*Ferry* cases does not convince us that the court has moved away from the *Ferry* clear and convincing evidence standard.[9]

■ We turn now to an examination of the correctness of the trial court's corpus

9. Because we conclude that the evidence in this case is sufficient under *Ferry* to satisfy the corpus delicti rule, there is no occasion for us to address the "trustworthiness" standard pressed upon us by the State. *See State v. Parker,* 315 N.C. 222, 236, 337 S.E.2d 487, 495 (1985).

delicti ruling on the motion for a new trial. Because *Johnson* made statements that potentially create corpus delicti concerns in both counts I and III, we will analyze the counts separately. With respect to count I, attempted murder by the use of heroin, the evidence shows that prior to the administration of the heroin, Johnson made statements indicating that she wanted to use it to overdose her husband. Under the pre- and postcrime distinction adopted above, these remarks were not covered by the corpus delicti rule and were admissible as statements against interest. However, incriminating statements after she administered the heroin to her husband are subject to the corpus delicti rule. Included are Johnson's statement to Officer Vojtecky that she had given her husband heroin on January 21, 1989, and her statement to Cindy Orozco that the "stuff didn't work." The trial court's ruling that these admissions were not subject to the corpus delicti rule was incorrect.

Even though the court erred in admitting the evidence under the basis it stated, however, the error was harmless. An examination of the evidence of the corpus delicti on count I clearly establishes that it was sufficient to establish corpus delicti, even without these latter statements. Under the Utah corpus delicti rule, before postcrime inculpatory statements are admissible, the State must show by clear and convincing evidence that (i) a wrong was done and (ii) such wrong was the result of criminal conduct. *See, e.g., Calamity*, 735 P.2d at 41; *Knoefler*, 563 P.2d at 176; *Johnson*, 95 Utah at 580–81, 83 P.2d at 1014–15. The first part of the corpus delicti test is met here, i.e., there is clear and convincing independent evidence of a wrong. Peggy Johnson stated that she wanted to purchase the heroin so that she could kill her husband with it. The heroin was purchased and delivered to her on January 21. There was also physical evidence that Johnson had placed harmful substances, including oxalic acid, in her husband's medicine on other occasions. Danny testified that five hours after taking his capsules on the night of January 21–22, he was dizzy and sweaty. He also testified that he vomited at that time. Danny's symptoms were consistent with the ingestion of heroin.

There is likewise sufficient evidence to satisfy the second part of the corpus delicti test—that the wrong was caused by unlawful means. The same evidence supporting part one of the test also supports part two. Taken as a whole, this evidence is sufficient under *Ferry* to support the inference that the heroin was placed in the capsules and that they produced the violent physical reaction by Johnson's husband. We conclude that the evidence is sufficient to constitute clear and convincing proof of the corpus delicti of count I. Therefore, even though the trial judge may have erred in concluding that Johnson's postcrime statements regarding the administration of heroin in the capsules were not covered by the corpus delicti rule, any such error was harmless. Ample evidence for a foundation for the admissibility of those statements was adduced, even if not in the proper order.

Turning to count III, attempted murder through the administration of oxalic acid, all Johnson's statements were subject to the corpus delicti rule because they were made after she had administered the drug. Again, the trial court erred when it admitted the evidence without first making a determination that the corpus delicti rule was satisfied. Nevertheless, as is the case with count I, we conclude that there was sufficient evidence of the corpus delicti to allow the admission of Johnson's statements, and therefore, the error was harmless.

The two elements to be proven under the corpus delicti rule are a wrong and linkage to criminal agency. In the case of oxalic acid, the wrong is the fact of the administration of oxalic acid. There is ample evidence that it was administered to Danny Johnson. A bottle was found in Johnson's home that contained the same substance found in the capsules Danny was taking. Danny also testified that when he took the capsules they upset his stomach and, on one occasion, burned his throat. As for the criminal agency, the presence of the sub-

stance in the ampicillin capsules without Danny's knowledge is sufficient proof. Here, as with count I, any error in admitting the postcrime inculpatory statements before finding the corpus delicti rule satisfied was harmless.

Johnson's conviction on count I is affirmed. Her conviction on count III is vacated and replaced with a conviction for attempted second degree murder. Finally, her conviction on count II is reversed.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.